**HUNTER INDUSTRIAL FACILITIES, INC., Appellant,**

v.

**TEXAS NATURAL RESOURCE CONSERVATION COMMISSION, et al., Appellees.[1]**

No. 03-94-00335-CV.

Court of Appeals of Texas, Austin.

Oct. 11, 1995.

Rehearing Overruled Dec. 13, 1995.

---

537 at 540 (Tex.App.—Houston [1st Dist.] 1993, pet'n ref'd).

1. Intervenor-Appellees include: City of Houston; Harris County; Harris County Fresh Water Sup-

ply District No. 58; Harris County Utility District No. 5; Harris County Municipal Utility District No. 132.; Friends Insist Stop Toxics; Families Against Contaminated Environment; Honorable Bill Daniel; and Baylor University.

Roy Q. Minton, Minton, Burton, Foster & Collins, Austin, TX, for Appellant.

Timothy Lignoul, Assistant City Attorney, City of Houston, Houston, TX, for City of Houston.

Jimmy Alan Hall, Scanlan & Buckle, P.C., Austin, TX, for Families Against Contaminated Environment.

Mary W. Carter, Blackburn & Carter, P.C., Houston, TX, for Friends Insist Stop Toxics.

Bill Daniel, Liberty, TX, for Baylor University.

Mike Driscoll, Harris County Attorney, Cathy Sisk, Assistant County Attorney, Houston, TX, for Harris County.

William L. Corsbie, Austin, TX, for Harris County Fresh Water Supply.

Oliver Pennington, Fulbright & Jaworski, Houston, TX, for Harris Co. Municipal Utility.

Dan Morales, Attorney General, Linda B. Secord, Assistant Attorney General, Environmental Protection Division, Austin, TX, for Texas Natural Resource Conservation Committee.

Before ABOUSSIE, KIDD and B.A. SMITH, JJ.

KIDD, Justice.

This case of first impression involves the interpretation and application of certain statutory standards under the Solid Waste Disposal Act.[2] In 1989, appellant Hunter Industrial Facilities, Inc. ("HIFI") filed applications with the Texas Natural Resource Conservation Commission[3] ("the Commission") for fourteen permits to construct and operate an above-ground waste storage and processing facility in the North Dayton Salt Dome. HIFI planned to use ten solution-mined salt caverns for the disposal of hazardous waste[4] and three deep injection wells to dispose of nonhazardous brine created by the solution-mining process. The type of facility that HIFI proposed is highly experimental. Although salt domes have been used to store oil and gas, they have not been used previously in the United States for the storage of hazardous waste. HIFI proposed to irretrievably inject the waste into the ten salt caverns, a method that had not been tested anywhere in the world.[5] The proposed site

2. Tex.Health & Safety Code Ann. §§ 361.001–.540 (West 1992 & Supp.1995) (hereinafter "SWDA").

3. Formerly the Texas Water Commission.

4. The wastes included industrial byproducts such as sludges, chemicals, ash, and contaminated soil. HIFI did not apply for permits to dispose of radioactive wastes.

5. HIFI contended that salt dome technology was not an experimental method because it had been used successfully in Germany for several years. Although HIFI presented evidence that Germany has one salt dome cavern similar to those that HIFI proposed, an expert witness noted that "it is a new technology in the respect that no one has put waste in a salt cavern and sealed it up yet." The German method differs considerably from HIFI's, as Ben Knape, supervisor of the

is located northeast of Houston and within a few miles of the Evangeline Aquifer, which supplies water to many area residents.

A contested case hearing began on August 14, 1990. The Commission subsequently imposed a moratorium on permitting and the hearing was delayed for two years. The evidentiary hearing continued on June 29, 1992 and was completed on October 1, 1992. On December 9, 1992, the two hearing examiners submitted a proposal for decision ("PFD") recommending that HIFI receive ten of its fourteen requested permits, including permits for six of the ten hazardous waste injection wells HIFI had proposed.

At a January 6, 1993 meeting to consider the applications and the PFD, the Commission voted unanimously to deny all of HIFI's applications. HIFI sought judicial review in district court, which affirmed the Commission's order. By one point of error HIFI appeals, arguing that the district court erred in not overruling the Commission's order because it was arbitrary and capricious and made in violation of the SWDA. We will affirm the trial-court judgment.

## POLICY CONSIDERATIONS

Hazardous waste includes any solid waste which may "cause, or significantly contribute to an increase in mortality or ... illness," or "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5)(A)–(B) (1988); see SWDA § 361.003(15) (adopting federal definition of hazardous waste). HIFI concedes that if the hazardous waste is improperly handled at its facility, it can have toxic, corrosive, and flammable effects. The danger to the public health and the environment if HIFI's facility does not work as proposed is undisputed.

The legislature was undoubtedly aware of these risks when it enacted the SWDA. The state's policy is explicitly provided:

It is this state's policy and the purpose of this chapter *to safeguard the health, welfare, and physical property of the people and to protect the environment* by controlling the management of solid waste, including accounting for hazardous waste that is generated.

SWDA § 361.002(a) (emphasis added). The SWDA further provides that the Commission may adopt rules to establish minimum standards for the operation of solid waste facilities. SWDA § 361.024.

The Commission's duty under these statutes is critical—it is charged with protecting the lives and health of Texas citizens. It has the ultimate responsibility to assure that facilities satisfy strict safety criteria before permits are issued. Any failure to perform these functions properly could have serious consequences for citizens and the environment. One need only examine disasters such as Love Canal to understand the Commission's profound obligation. *See* Marla J. Aspinwall, Note, *The Applicability of General Liability Insurance to Hazardous Waste Disposal,* 57 S.Cal.L.Rev. 745, 746–47 (1984) (discussing effects of improperly stored wastes on health and property of Love Canal residents). As one commentator observed, disastrous consequences may result from a failure to strictly adhere to regulations and guidelines for waste permitting:

For decades American industry has generated and discarded hazardous wastes.... Most of this waste is not destroyed but stored—sealed by commercial waste facilities in 55–gallon drums and deposited in clay-lined dumps, injected deep underground between layers of rock, or abandoned in vacant lots, lagoons, or landfills. Over time, at varying rates, the storage methods fail: containers corrode, plants or animals pierce protective linings, rain and melting snow wash wastes from their stor-

Commission's underground injection control section, testified:

The projects that we are aware of ... involve conventionally mined openings or caverns inside a salt dome so that the salt is dug or excavated out and in contrast to proposals

such as Hunter and URR where it's solution mined. In those conventionally mined sites, they're—by their very nature, people go down in the mine and work the salt, and it is clearly easier to install instrumentation all through the site of the facility.

age sites. Sometimes these abandoned chemicals intermingle, synergistically enhancing either their migratory or toxic potential. Eventually hazardous wastes infuse lakes and streams, underground waters, soil, and air, and from there come into contact with unprotected victims.

Exposure to hazardous wastes can cause cancer, genetic mutation, birth defects, miscarriages, and damage to the lungs, liver, kidneys, or nervous system. Even when leaking waste sites are detected before a significant number of humans have been exposed, toxic wastes may already have contaminated water supplies.

*Developments in the Law: Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1462–63 (1986).

Because the Commission is charged with the ultimate duty to prevent damage to public health and the environment, it carefully scrutinizes every aspect of any facility that seeks a permit. To do otherwise would render the Commission derelict in its duty. The Commission undoubtedly realized the significant health and environmental risks potentially posed by HIFI's proposed experimental waste facility. Apparently, these risks played a prominent role in the Commission's actions in the instant cause.

## PROCEDURAL QUESTIONS

*Standard of Review Under § 361.0832*

■ Generally, agency heads have broad discretion to adopt or reject a hearing examiner's findings and conclusions in a proposal for decision. *See Ross v. Texas Catastrophe Property Ins. Ass'n,* 770 S.W.2d 641, 642 (Tex.App.—Austin 1989, no writ) ("A hearing examiner has no power to bind an agency with a proposal for decision."). The SWDA, however, curtailed the Commission's discretion to overturn the examiners' findings and conclusions. In this regard, the Act provides:

(c) The commission may overturn an underlying finding of fact that serves as the basis for a decision in a contested case only if the commission finds that the finding was not supported by the great weight of the evidence.

(d) The commission may overturn a conclusion of law in a contested case only on the grounds that the conclusion was clearly erroneous in light of precedent and applicable rules.

(e) If a decision in a contested case involves an ultimate finding of compliance with or satisfaction of a statutory standard the determination of which is committed to the discretion or judgment of the commission by law, the commission may reject a proposal for decision as to the ultimate finding for reasons of policy only.

SWDA § 361.0832(c)–(e).

The crux of this appeal involves the extent to which these subsections of the Solid Waste Disposal Act restrict the Commission's discretion to overturn a hearing examiner's decision. We will therefore examine each of the subsections in some detail in order to make this preliminary determination.

*Subsection (c)—Underlying Findings of Fact*

■ Under subsection (c), the Commission is permitted to overturn an underlying finding of fact *only* if it is "not supported by the great weight of the evidence." SWDA § 361.0832(c). HIFI contends that this legislative mandate is essentially the same as the "*against* the great weight of the evidence" standard of appellate evidentiary review. HIFI analogizes to this standard in asserting that the Commission may overturn an examiner's finding only if it is *against* the great weight of the evidence.

In determining a statute's meaning, we are guided by certain well-settled principles of statutory construction. First and foremost, we must follow the plain language of the statute. If a statute is clear and unambiguous it should be given its commonly understood meaning without resort to extrinsic aids of statutory construction. *Cail v. Service Motors, Inc.,* 660 S.W.2d 814, 815 (Tex. 1983). If a statute is ambiguous, however, extrinsic aids, such as the interpretation of the agency charged with the statute's enforcement, may be used to determine legislative intent. *Ex parte Roloff,* 510 S.W.2d 913, 915 (Tex.1974); *Meno v. Kitchens,* 873 S.W.2d 789, 791 (Tex.App.—Austin 1994, writ

denied). In examining subsection (c), we agree with the Commission that the term "not supported by the great weight of the evidence" contains no inherent ambiguities that would require us to look beyond the statute for clarification.

HIFI argues that "against the great weight" and "not supported by the great weight" are functionally equivalent standards.[6] *Compare Meraz v. State,* 785 S.W.2d 146, 154–56 (Tex.Crim.App.1990) (discussing use of the "against the great weight" standard for issues on which criminal defendant bears burden of proof) *with Brown v. State,* 804 S.W.2d 566, 571 (Tex.App.—Houston [14th Dist.] 1991, pet. ref'd) (citing *Meraz* for proposition that criminal defendant's conviction may be reversed if "not supported by" great weight of evidence). We disagree with HIFI's interpretation. The legislature undoubtedly was aware that "against the great weight" was a standard used by appellate courts. It chose, however, not to incorporate this well-understood language, and opted instead for a "not supported by the great weight" standard. The supreme court has noted that, in construing statutes:

> Courts must take statutes as they find them.... They should search out carefully the intendment of a statute, giving full effect to all of its terms. But *they must find its intent in its language and not elsewhere....* They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law.

*Republicbank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985) (quoting *Simmons v. Arnim,* 220 S.W. 66, 70 (Tex.1920)) (emphasis added). Therefore, we must give effect to the standard articulated in the statute, and we are not permitted to substitute an "against the great weight" standard since it is not clear that the legislature intended to impose that standard on the Commission.

■ However, we agree with HIFI's assertion that in enacting subsection (c), the legislature intended to *significantly restrict* the Commission's discretion to reject an ex-

aminer's underlying fact findings. Before the enactment of subsection (c), the Commission had broad discretion to reject an examiner's underlying fact findings. *See Ross,* 770 S.W.2d at 642 (agency may reject examiner's proposal for decision). This discretion was limited only by the requirement that an agency's final decision be supported by substantial evidence in the record. *See Texas Health Facilities Comm'n v. Charter Medical—Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex. 1984). Under the substantial evidence test, an agency's action will be sustained if reasonable minds could reach the conclusion that the agency must have reached in order to justify its action. *Id.* at 453. If the evidence supports *either* an affirmative or negative finding on a particular issue, the agency's decision must be upheld. *Auto Convoy Co. v. Railroad Comm'n,* 507 S.W.2d 718, 722 (Tex. 1974). Indeed, the evidence in the record may actually preponderate *against* the agency's decision, yet satisfy the substantial evidence standard. *Lewis v. Metropolitan Sav. & Loan Ass'n,* 550 S.W.2d 11, 13 (Tex.1977); *see Charter Medical,* 665 S.W.2d at 452. Therefore, we conclude that under subsection (c), the Commission is no longer permitted to overturn an examiner's underlying finding of fact because it would have reached a contrary decision, but can only exercise its discretion to reverse those findings that do not find support in the "great weight" of the evidence in the record.

*Subsection (d)—Conclusions of Law*

■ Under subsection (d), the Commission is permitted to overturn a conclusion of law if it is *clearly erroneous* in light of precedent or applicable rules. SWDA § 361.0832(d). HIFI argues that in a case of first impression, the Commission must follow the legal interpretations, *if reasonable,* of the hearing examiner. The Commission sharply criticizes HIFI's position, contending that the agency's decision, and not the hearing examiner's recommendation, establishes agency precedent and policy; consequently, the

---

**6.** Although HIFI argues that the two phrases are synonymous, they appear to have opposite meanings.

Commission is not bound by a hearing examiner's conclusions of law.

■ A finding is considered clearly erroneous when the reviewing body "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The "clearly erroneous" standard is generally considered to give the reviewing body broader authority than is allowed under a "substantial evidence" review because a decision may be overturned despite its theoretical reasonableness. *See Watson v. Gulf Stevedore Corp.*, 400 F.2d 649, 653 (5th Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969) (noting that "findings may be clearly erroneous *without being unreasonable* so as to be upset under the substantial-evidence rule") (emphasis added); Bernard Schwartz, *Administrative Law* § 10.11, at 605 (2d ed. 1984).

HIFI contends that the hearing examiners' legal conclusions, if reasonable, bind the Commission because section 361.0832(d) has not been construed previously. The Commission correctly asserts that, although there is no precedent under section 361.0832(d), it may find a conclusion clearly erroneous in light of its applicable rules. *See* SWDA § 361.0832(d). The Commission is required to control all aspects of the management of industrial wastes and must adopt any rules necessary to carry out its powers and duties. *See* SWDA § 361.017; Tex.Water Code Ann. § 5.103(a) (West 1988). The Commission is charged with the protection of the environment, the public health, ·and the safety of Texas citizens. *See* SWDA § 361.114(b)(3). Forcing the Commission to accept the hearing examiners' conclusions of law, if reasonable, would destroy the Commission's discretion to interpret the rules that the Commission *itself* has promulgated. We will apply the standard articulated in *United States Gypsum*, 333 U.S. at 395, 68 S.Ct. at 541–42, in determining whether the Commission correctly overturned the hearing examiners' conclusions of law.

*Subsection (e)—Ultimate Findings—Policy Considerations*

■ The parties dispute the interpretation of subsection (e), which permits the Commission to overturn an examiner's proposal for decision as to *ultimate findings* based on policy reasons if the findings involve compliance with or satisfaction of a statutory standard the determination of which is committed to the Commission's discretion. SWDA § 361.0832(e). The parties' principal conflict concerns the construction of the phrase "may reject a proposal for decision as to the ultimate finding for reasons of *policy only.*" *Id.* (emphasis added).

HIFI argues that ultimate findings can *only* be rejected on policy grounds, thereby rendering the Commission's reliance on section 361.0832(e) improper because the Commission relied on *both* policy and factual grounds to reject the hearing examiners' PFD. The Commission responds that subsection (e) does not *restrict* its ability to reject a PFD, but rather provides an additional means by which the Commission may act. According to the Commission, a PFD may be rejected on the basis of an ultimate finding if the underlying findings of fact and conclusions of law do not support the finding; even if they support the PFD, however, the Commission argues that it may reject the PFD for reasons of policy if any ultimate finding concerns compliance with a statutory standard.

■ An ultimate finding usually involves "a conclusion of law or at least a determination of a mixed question of law and fact." *Helvering v. Tex–Penn Oil Co.*, 300 U.S. 481, 491, 57 S.Ct. 569, 574, 81 L.Ed. 755 (1937); *see Pedernales Elec. Coop., Inc. v. Public Util. Comm'n*, 809 S.W.2d 332, 339 (Tex. App.—Austin 1991, no writ); *see also* Bob E. Shannon & James B. Ewbank, II, *The Texas Administrative Procedure and Texas Register Act Since 1976—Selected Problems*, 33 Baylor L.Rev. 393, 409 (1981). Therefore, an "ultimate finding of compliance with or satisfaction of a statutory standard the determination of which is committed to the discretion or judgment of the commission by law" has the same legal effect as a conclusion of law or a mixed question of law or fact. *See* SWDA

§ 361.0832(e); Shannon & Ewbank, *supra*, at 409. Clearly, the legislature did not intend that the PFD may be rejected as to an ultimate finding *only* on the basis of policy, but rather that it could be rejected if the ultimate finding: (1) is not supported by the underlying facts, (2) is clearly erroneous, *or* (3) contravenes the Commission's policies. *See* SWDA § 361.0832(c)–(e). Because ultimate findings invariably involve conclusions of law or mixed questions of law and fact, it was not improper for the Commission to rely upon *both* policy and factual grounds in concluding that the examiners' PFD should be rejected because it involved an ultimate finding of compliance with a statutory standard.

*Standard of Review for Appellate Courts*

■ The parties also disagree about the appropriate standard for judicial review in this cause.[7] HIFI contends that because SWDA section 361.0832 limits the Commission's discretion, a reviewing court must perform a more rigorous examination to determine whether the Commission has properly overturned the examiners' findings and conclusions. The Commission responds that the APA requires only a substantial evidence review of its order because section 361.0832 does not provide a standard for judicial review. *See* APA §§ 2001.173(a), 2001.174(2)(E); *Charter Medical*, 665 S.W.2d at 452–53 (describing principles and presumptions applicable to substantial evidence review). We agree with HIFI. Because SWDA section 361.0832 provides standards detailing when the Commission may properly overturn the findings, conclusions, and ultimate findings of a hearing examiner, APA section 2001.174(2) governs our review. That section provides that a reviewing court may reverse or remand an agency determination when "the administrative findings, inferences, conclusions, or decisions are: (A) in

violation of a constitutional or statutory provision [or] (B) in excess of the agency's statutory authority." APA § 2001.174(2)(A)–(B).

■ An agency may exercise only the authority "conferred upon it by law in clear and unmistakable terms and the same will not be construed as being conferred by implication." *Key W. Life Ins. Co. v. State Bd. of Ins.*, 350 S.W.2d 839, 848 (Tex.1961); *see Sexton v. Mount Olivet Cemetery Ass'n*, 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.) (agencies are statutory creations with no inherent authority). When an agency misapplies a statute it commits an error of law or abuses its discretion. *See* APA § 2001.174(2)(A)–(D).

In our appellate review, we must examine whether the Commission committed legal error in overturning a hearing examiner's PFD. Under SWDA section 361.0832, the Commission is no longer permitted to merely substitute its judgment for that of the hearing examiner, but must conform to certain prescribed statutory standards in overturning findings and conclusions. Therefore, we must examine the Commission's findings and conclusions that reversed those of the hearing examiner to determine whether the Commission violated the proscriptions of section 361.0832 in so doing.

**DISCUSSION**

In its order denying HIFI's applications for permits, the Commission focused on four critical areas in which it rejected the hearing examiners' findings and conclusions:

1. The Commission rejects the Examiners' finding and conclusion that HIFI adequately characterized the salt dome. . . .

2. The Commission rejects the Examiners' finding and conclusion that HIFI

7. Section 2001.174 of the Administrative Procedure Act defines the scope of judicial review of administrative decisions and provides that the reviewing court shall reverse or remand the case for further proceedings if the administrative findings, inferences, conclusions, or decisions are:
 (A) in violation of a constitutional or statutory provision;
 (B) in excess of the agency's statutory authority;

 (C) made through unlawful procedure;
 (D) affected by other error of law;
 (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or
 (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
 Tex.Gov't Code Ann. § 2001.174 (West 1995) (hereinafter "the APA").

**106**

adequately demonstrated how it intends to obtain financing to construct the facility....

3. The Commission rejects the Examiners' finding and conclusion that HIFI adequately demonstrated that there exists an urgent public necessity for the hazardous waste injection well....

4. The Commission rejects the Examiners' finding and conclusion that HIFI demonstrated that the underground injection wells are in the public interest....

The Commission concluded that these were "ultimate" statutory or regulatory issues requiring affirmative findings as a condition to granting the permits. *See Charter Medical,* 665 S.W.2d at 449–50. Because these are ultimate issues, a negative finding on any one is sufficient to support the Commission's denial of HIFI's permits. *Gerst v. Goldsbury,* 434 S.W.2d 665, 667 (Tex.1968) (order of disapproval is correct if substantial evidence supports any of agency's negative findings). HIFI disputes the Commission's findings and conclusions on each of these statutory and regulatory issues, arguing that the Commission impermissibly overturned findings of fact and conclusions of law in violation of sections 361.0832(c) and (d), and improperly overturned the PFD in violation of sections 361.0832(e) and (f).[8]

*Geologic Characterization*

HIFI initially challenges the Commission's findings and conclusions that HIFI failed to adequately characterize the geology of the North Dayton salt dome. The examiners concluded that HIFI's geologic data was imprecise; however, they attempted to overcome this imprecision by blending two separate requirements under the Salt Dome Rules: (1) a thorough geologic characterization of the salt dome; and (2) the minimum of 500 feet distance between the salt cavern injection zone boundaries and the boundaries of the salt stock. *See* 30 Tex.Admin.Code §§ 331.121(d)(1)(A), 331.164(b)(1) (1995) (hereinafter "TAC").[9] The examiners decided that TAC sections 331.121 and 331.164 could be read together to require "the applicant to delineate the edge of the salt stock sufficiently to establish that there would be at least 500 feet of salt between the injection zone and the nearest possible edge of the salt stock." The examiners then estimated a margin of error, and determined that permits should be issued for six of the ten proposed injection wells. The examiners also concluded that HIFI could perform post-permit tests to adequately characterize the dome. The Commission rejected the hearing examiners' blending of the regulations and their allowance of post-permit testing:

> The Examiners lack authority to relax those standards or to relax the amount of evidence needed to meet that burden of proof.... [T]he Commission does not concur with the Examiners that the proper remedy is to allow the applicant to produce its proof after a final decision on the application. Nor is the proper remedy to ignore uncertainties in evidence by substituting imprecise estimates for proof of facts.

We believe that the Commission was well within its discretion in concluding that the examiners erred in formulating remedies for

8. Subsection (f) provides:
The commission shall issue written rulings, orders, or decisions in all contested cases and *shall fully explain in a ruling, order, or decision the reasoning and grounds for overturning each finding of fact or conclusion of law or for rejecting any proposal for decision* on an ultimate finding.
SWDA § 361.0832(f) (emphasis added).

9. HIFI contends that section 331.121(d)(1)(A) does not mandate that the edge of the salt dome be defined with absolute precision. *See* 17 Tex. Reg. 4097, 4102 (1992) (substituting the word "thorough" for the term "complete" in the regulation). HIFI repeatedly asserts that it performed a well-studied characterization of the

dome, and the Commission's imposition of a "precise characterization" standard was unfair in that it required additional and unnecessary testing. HIFI's assertion is controverted by the hearing examiners' PFD, which found that the "applicant's evidence ... is not precise," and that it is "uncontroverted that additional information could have been developed to more precisely define the edge of the salt stock in the vicinity of the proposed caverns." HIFI's contention that it performed a well-studied characterization is also belied by its acquiescence to the examiners' request "to conduct the additional testing ... to confirm the edge of the salt if permits are issued."

HIFI's failure to thoroughly characterize the salt domes in question.

The type of blending and estimating done by the examiners could be considered inappropriate for the experimental facility proposed in the instant cause; the Commission was entitled to require strict adherence to the SWDA and the Salt Dome Rules. The legislature, in enacting the SWDA, evinced a clear policy that protection of the public and the environment would constitute the top priority: "It is this state's policy and the purpose of this chapter to *safeguard the health, welfare, and physical property of the people and to protect the environment* by controlling the management of solid waste...." SWDA § 361.002(a) (emphasis added). Given the primacy of these legislative concerns, the Commission must ensure that every regulation is satisfied. The failure to satisfy the standards is not, as HIFI argues, merely a technical violation. Rather, such a failure can have a devastating effect on the principal water supply of many Houston residents, on the health of Texas citizens, and on the environment. HIFI candidly admits that if the waste it proposes to inject is stored improperly, it can have toxic, corrosive, and flammable characteristics that threaten human health and the environment. Contrary to HIFI's and the examiners' conclusion that the regulations can be blended so as to compensate for the failure to satisfy some requirements, each regulation is a separate requirement with which an applicant must comply in order to receive a permit.

The Commission did not err in concluding that the examiners lacked the authority to blend regulations and allow post-permit testing because these variances violate the statutory and regulatory tenets under which the Commission is empowered to act. This Court was confronted with a similar situation in *Flores v. Texas Dep't of Health*, 835 S.W.2d 807 (Tex.App.—Austin 1992, writ denied). The waste permit controversy in *Flores* concerned the determination of the groundwater level, with the possible consequence of error being groundwater contamination. *Id.* at 808. The experts' opinions of the water level ranged from sixteen to sixty feet; the Department averaged the various estimates, and then set the groundwater level for design purposes at thirty-three feet. In concluding that substantial evidence did not support the Department's decision, we noted that although the Department is entitled to use its specialized skills in analyzing evidence, it is bound by the requirements of its own substantive rules, the enabling statute, and the APA. *Id.* at 811.

In a similar fashion, the examiners in the instant proceeding were required to exercise their powers according to the Salt Dome Rules and the Solid Waste Disposal Act. They were bound by those rules to the same degree as all other participants in the proceeding. *First Fed. Sav. & Loan Ass'n v. Vandygriff*, 639 S.W.2d 492, 499 (Tex.App.—Austin 1982, writ dism'd). The examiners chose to blend rules and to allow post-permit testing. The Commission, relying on the Salt Dome Rules and the SWDA, had the discretion to determine that the examiners erred in fashioning such remedies due to the imprecision in HIFI's characterization of the dome.

■ HIFI also argues that it was not required to perform certain tests before obtaining a permit because, under SWDA section 331.164(b)(1), it could rely solely on *available* geologic data to determine the salt stock's edge. 30 TAC § 331.164(b)(1). Section 331.121(d)(1)(A), however, requires a permit applicant to utilize well logs, seismic reflection surveys, gravity surveys, and *any other appropriate geophysical methods necessary to characterize the salt dome.* SWDA § 331.121(d)(1)(A). Reliance on currently available data may be inadequate if newer geophysical methods are available that provide a more thorough characterization.

HIFI nevertheless contends that the Commission incorrectly concluded that HIFI was required to conduct a vertical seismic profile (VSP)[10] prepermit because the rules expressly mandate that a VSP is to be conducted *after* a permit is issued. 31 TAC

---

**10.** VSP involves the recording of sound energy, such as reflections and echoes, which is detected

by a geophone lowered into a wellbore below the ground level.

§ 331.163(e)(1)(F).[11] HIFI does not deny that VSP was an appropriate geophysical method to characterize the dome, but argues that a second test would have been extremely costly. Although it is an expensive undertaking to perform VSP tests twice, the Commission is permitted to so require under the Solid Waste Disposal Act. *See* SWDA § 361.017(b); Tex.Water Code Ann. § 5.103(a) (West 1988). The margin of error without the test is 350 feet, while the use of VSP would have characterized the edge of the dome to within twenty-five to seventy-five feet. Under SWDA section 331.121(d)(1)(A), the Commission did not err in determining that the characterization of the dome was not thorough because another geophysical method existed that provided greater precision in analyzing the data.

It is undisputed that HIFI's mapping of the dome was imprecise. A thorough characterization of the edge of the salt stock is imperative to ensure that hazardous waste will not escape from its protective storage environment. Unlike the examiners, however, the Commission concluded that HIFI could not overcome this imprecision by blending different sections of the Salt Dome Rules. Under subsection 361.0832(d), the Commission was not compelled to accept the hearing examiners' conclusions if it was left "with the definite and firm conviction that a mistake has been committed." *United States Gypsum,* 333 U.S. at 395, 68 S.Ct. at 542. The two regulations provide no indication that they were intended to be read together. Indeed, each is concerned with different points in the process: section 331.121(d)(1)(A) involves thorough characterization during the application process, while section 331.164 specifically concerns the construction of the salt caverns. *See* 30 TAC §§ 331.121(d)(1)(A), 331.164(b)(1). Although some overlap occurs because both require delineation of the edge of the salt stock, section 331.121(d)(1)(A) requires additional information from an applicant: imaging un-

derneath of all overhangs, defining caverns or other co-uses of the stock, and addressing any conditions that may result in potential adverse impact on the salt stock. 30 TAC § 331.121(d)(1)(A). HIFI failed to adequately address these issues.

■ The statutory standards restricting the Commission's power to overturn the examiners' conclusions of law did not divest the Commission of its ability to interpret its own rules. The Commission's interpretation of its own regulations is entitled to deference by reviewing courts, and may not be overturned unless it is erroneous or inconsistent with the regulation. *Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex. 1991); *see also North Alamo Water Supply Corp. v. Texas Dep't of Health,* 839 S.W.2d 448, 455 (Tex.App.—Austin 1992, writ denied). Finding no indication in the regulations that the Commission's interpretation was erroneous, we conclude that the Commission did not violate the proscriptions of SWDA section 361.0832 by overturning the examiners' findings of fact and conclusions of law as they related to a "thorough geologic characterization" of the salt dome.

*Financial Assurance*

■ The Commission also denied the PFD because it rejected the examiners' finding that HIFI had adequately demonstrated how it intended to obtain construction financing. The SWDA specifies the financial assurances an applicant must provide. *See* SWDA § 361.085(a); 30 TAC § 305.50(4)(B)–(D) (offering non-exclusive list of categories of financial information that applicants can provide). During the hearing, HIFI offered the testimony of Rohan Paul, a Vice President at Chemical Bank, and Brian Hand, a financial analyst with First Analysis Corporation. Both witnesses testified that HIFI could acquire the money to finance the construction through a combination of equity

---

11. Despite the parties' reliance on section 331.163(e)(1)(F), the Commission never promulgated this section. Section 331.163(e)(1)(F) does not appear in either the original proposed rule or the final order adopting the Salt Dome Rules. *See* 17 Tex.Reg. 2185, 2194 (1992); 17 Tex.Reg. 4097, 4110 (1992). Under the APA, the Commis-

sion must give thirty days' notice of its intent to adopt a rule, and notice of the proposed rule must be filed with the Secretary of State for publication in the Texas Register. APA § 2001.023. Because section 331.163(e)(1)(F) concerned postpermit procedures only, it is not germane to HIFI's appeal.

and long-term debt financing. Although Hand testified that institutional debt financing [12] could be used to finance construction, Paul opined that the institutional debt market would probably not be used during the construction phase because this type of investor "will be more interested ... once the project is up and running and it has demonstrated formally the ability to generate cash flow."

The examiners found that HIFI had adequately established its ability to obtain sufficient funding through equity investors and the institutional debt market to construct its facility in a safe manner. The Commission rejected this finding, concluding that a discrepancy existed between Paul's and Hand's testimony on institutional financing that rendered the examiners' finding not supported by the great weight of the evidence. *See* SWDA § 361.0832(c).

After reviewing the disputed testimony, we conclude that the Commission erred in overturning the examiners' finding, because the testimony was not contradictory. Paul did not testify that institutional debt financing could not be used during construction; he merely stated that he did not *anticipate* the use of this type of investor during the construction phase. Because HIFI provided at least one viable plan for construction financing, the Commission improperly applied section 361.0832(c) to overturn the examiners' findings.

*Public Necessity and Public Interest*

As additional grounds for denying the permits, the Commission rejected the examiners' findings and conclusions that an urgent public necessity for the hazardous waste injection wells existed and that the wells would be in the public interest. Before the Commission grants a permit, it must conclude that an urgent public necessity exists. SWDA § 361.114(b) (specifying five criteria for determining "urgent public necessity");

Tex.Water Code Ann. § 27.051(g)(2) (West Supp.1995) (same). The Commission must also conclude that the injection well would further the public interest. Tex.Water Code Ann. § 27.051(a)(1) (West 1988).

The Commission focused on two issues in determining whether the urgent public necessity and public interest requirements had been satisfied: need and safety. The Commission found that the hearing examiners had incorrectly determined the weight of the evidence relative to these two issues.

*1. Need*

To establish an urgent public necessity, an applicant must prove that there is a "substantial or obvious public need for additional hazardous waste disposal capacity and the hazardous waste injection well will contribute additional capacity toward servicing that need." SWDA § 361.114(b)(2); Tex.Water Code Ann. § 27.051(g)(2)(B) (West Supp. 1995). In assessing whether the wells are in the public interest, the Commission is statutorily required to examine need and consider whether practical, economic, and feasible alternatives to an injection well are reasonably available to manage the various types of hazardous waste. Tex.Water Code Ann. § 27.051(d)(2) (West Supp.1995).[13] In making this determination, the Commission must consider the need for various technologies for hazardous waste disposal. SWDA § 361.0232(a). In 1992, the Commission developed a Needs Assessment pursuant to the statutory directive that the Commission assess the need for various technologies for hazardous waste disposal. *Id.*

As a prerequisite to obtaining a permit, HIFI had to show a need for its proposed facility. HIFI apparently became concerned early in the process that the Commission's Needs Assessment failed to establish a level of need that would justify HIFI's proposed facility.[14] Therefore, HIFI presented Dr.

---

**12.** Institutional debt financing refers to raising funds through the sale of bonds, usually to institutional investors such as insurance companies and pension funds.

**13.** The statute provides three specific criteria that must be used to determine if the facility is in the public interest, but notes that the Commis-

sion may consider other factors. Tex.Water Code Ann. § 27.051(d) (West Supp.1995).

**14.** A letter from Dr. Joel Hirschorn to Keith Price, HIFI's president, indicates that Hirschorn believed that the Needs Assessment did not establish the requisite need:

Joel Hirschorn's testimony specifically to establish that the Needs Assessment had grossly underestimated need. The Needs Assessment estimated a capacity shortfall of 1.5 million tons by 1995.[15] Hirschorn testified that, based on his calculations, the shortfall would be approximately 13.65 million tons. The substantial disparity between these two calculations resulted from Hirschorn's use of different data and analyses to assess need. No evidence was offered to dispute Hirschorn's testimony. The examiners concluded that there was a substantial and obvious need for the facility. SWDA § 361.114(b)(2).

 At the agenda meeting to discuss the PFD, the Commissioners heard argument from the Commission staff, the examiners, and HIFI's attorney. HIFI argues that the Commissioners' rejection of the examiners' PFD was improperly based upon a discussion between Commissioner Hall and Kathy Ferland, a staff member who had not appeared as a witness at the examiners' hearing. Hall questioned Ferland extensively about the differences between the Needs Assessment and Hirschorn's testimony on need. HIFI contends that the Commissioners' reliance on Ferland's analysis constituted a procedural irregularity that denied HIFI due process.

Examining the record, we conclude that Hall and Ferland's discussion was not im-proper. HIFI's attorney was present and able to object whenever Ferland's analysis went beyond the evidence in the record. The Commissioners repeatedly admonished the parties to limit their comments to exhibits and testimony in the record. When the examiner indicated that comments were outside the record, the Commissioners either discontinued their line of questioning or indicated how the comments were derived from the record evidence.

The Commissioners understandably were interested in how Hirschorn estimated a level of need 780% greater than that of the Commission's own Needs Assessment. The purpose of the agenda meeting was for the parties to articulate their concerns about the reasoning and the conclusions of the hearing examiners in the PFD. *See* APA § 2001.062(a)(2) (adversely affected parties given opportunity to file exceptions and present briefs to the Commission explaining their concerns); John Powers, *Proposals for Decision* 8 (1991) ("[T]he parties in the contested case are able to place before the agency heads—the final decisionmakers—their contentions and arguments concerning what facts or evidence the preparer of the [PFD] might have overlooked, or to which he or she might have assigned an improper weight or meaning . . . .").[16]

I have assembled considerable information and performed some analyses related to the "needs" issue. I believe that I can make a strong point about the limits of the work done by TWC. Although I recognize that you do not want to seem overly critical of the TWC, *it seems to me that the "urgency" requirement necessitates some very different numerical conclusions regarding future capacity needs.* (Emphasis added.)

15. HIFI initially argues that the Commission improperly applied the Needs Assessment to its applications because a 1993 legislative amendment to SWDA mandated that the Commission's Needs Assessment could not be applied to applications, such as HIFI's, that were declared administratively complete and for which public hearings began before June 7, 1991. *See* Act of June 20, 1993, 73d Leg., R.S., ch. 1044, § 5, 1993 Tex.Gen.Laws 4459, 4461 (Tex.Health & Safety Code Ann. § 361.0234(c) (West Supp. 1995)). Although HIFI's application was completed before June 7, 1991, the SWDA amendment is not applicable here. The 1993 amendment did not become effective until after the

Commission's January 8, 1993 Final Order. HIFI nonetheless argues that the amendments should be retroactively applied. We disagree. Even a retroactive application of the amendment cannot alter the Commission's Final Order, which was rendered before the effective date of the amendment. *See Ex parte Abell*, 613 S.W.2d 255, 260 (Tex.1981) (procedural change in law cannot be used to invalidate steps previously taken in pending litigation, but will apply to any subsequent proceedings after effective date); *Bardwell v. Anderson*, 325 S.W.2d 929, 939 (Tex. Civ.App.—Houston 1959, writ ref'd n.r.e.) (past steps taken in litigation unaffected by procedural changes in the rules).

16. We note that the APA specifically permits the Commissioners to engage in ex parte communication with nonparticipating staff:

[A] member or employee of a state agency assigned to render a decision . . . in a contested case may communicate ex parte with an agency employee who has not participated in a hearing in the case for the purpose of using the special skills or knowledge of the agency and its staff in evaluating the evidence.

■ Similarly, the Commission's decision to disregard in large measure Hirschorn's testimony was not improper. The Commission is required to allow parties to present evidence. APA § 2001.051(2); *Lewis,* 550 S.W.2d at 15. The Commission, however, has the discretion to discount evidence that it does not consider credible. *See Fuel Distribs., Inc. v. Railroad Comm'n,* 727 S.W.2d 56, 61 (Tex.App.—Austin 1987, writ ref'd n.r.e.) (Commission not required to assign any weight to expert testimony); *see also Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984) (agency is primary fact-finding body and resolution of factual conflicts and ambiguities is the province of the administrative body).

HIFI further contends that, even if Hirschorn's testimony is disregarded, the Needs Assessment established a substantial and obvious need for the facility, or in the alternative, the Commission failed to articulate a clear standard of the requisite degree of need. The Commission concluded that although "some need exists for additional commercial waste management capacity for Texas-generated wastes[,] ... the [report] does not reflect that there is a substantial or obvious public need to permit this facility." The Solid Waste Disposal Act authorizes the Commission to make this type of determination. SWDA § 361.114(b)(2).

■ HIFI urges us to conclude that the Commission erred in determining that the examiners' findings on need were not supported by the great weight of the evidence and that a 1.5 million capacity shortfall does not constitute a substantial and obvious need. This determination, however, is specifically left to the Commission's discretion, with good reason. The Commission possesses the technical knowledge and expertise to determine what constitutes a substantial and obvious need; this Court does not possess the same type of expertise. *See Allied Bank Marble Falls v. State Banking Bd.,* 739 S.W.2d 73, 79 (Tex.App.—Austin 1987), *rev'd on other grounds,* 748 S.W.2d 447 (Tex.1988) (agency, not reviewing court, has the responsibility to

determine the meaning of the evidence based on its technical and scientific expertise); 2 Am.Jur.2d *Administrative Law* § 535, at 524 (1994) ("When very technical areas of expertise are involved, or when agencies are acting within their area of specialized knowledge, experience, and expertise, courts generally defer to agency decisions.").

■ Construction of a statute by the administrative agency charged with its enforcement is entitled to serious consideration if the construction is reasonable and does not contradict the statute's plain language. *Tarrant Appraisal Dist. v. Moore,* 845 S.W.2d 820, 823 (Tex.1993). The legislature obviously intended that the Commission, a politically accountable body, be responsible for assessing the need for different types of waste disposal technology. The Commission, adhering to this mandate, concluded that the need was not sufficiently substantial to justify HIFI's untested and experimental method of irretrievable waste injection.

■ Finally, HIFI contends that it was denied due process because the Commission never articulated a clear standard for the requisite level of need and never communicated to HIFI before the agenda meeting that it had failed to meet that evidentiary standard. Although HIFI apparently wants the Commission to first develop guidelines of what constitutes a substantial or obvious need, we disagree that the Commission is compelled to do so. "Substantial or obvious need" is a sufficiently definite standard.

In concluding that HIFI had not met that standard, the Commission could have considered many factors, such as the experimental nature of the facility, the adequacy of HIFI's data, estimates of the waste capacity shortfall, the desire to develop innovative techniques for disposal, and the proximity of the facility to water supplies for a major Texas city, in determining the need for HIFI's proposed facility. The Commission is charged with balancing these various competing considerations. It would be impracticable to require the Commission to determine in advance the requisite level of need to satisfy

APA § 2001.061(c). The instant cause, however, did not involve ex parte communications because

HIFI's attorney was present and able to object and to respond to Ferland's comments.

the "substantial or obvious" requirement. *See* SWDA §§ 361.114(b)(2), 361.0232(a) (Commission must evaluate need for different technologies for waste disposal).

■ We conclude that the Commission did not err in overturning the underlying finding on need because Hirschorn's assumptions regarding the Needs Assessment rendered the examiners' finding unsupported by the great weight of the evidence. SWDA § 361.0832(c).[17] Because the underlying finding of need is required in order to conclude that an urgent public necessity exists, the Commission did not err in overturning the examiners' findings on the ultimate finding of urgent public necessity. *See Charter Medical*, 665 S.W.2d at 453 (underlying findings must support ultimate finding in order to uphold ultimate finding); *Railroad Comm'n v. Graford Oil Corp.*, 557 S.W.2d 946, 950 (Tex.1977) ("The findings should be such that a court, on reading them, could fairly and reasonably say that they support the ultimate findings of fact....").

*2. Safety*

■ The Commission is required to make certain findings regarding the safety of the proposed facility before a hazardous waste permit may be granted. SWDA § 361.114(b)(1), (3), (4); Tex.Water Code Ann. § 27.051(g)(2)(A), (C), (D) (West Supp. 1995). In its order, the Commission agreed with the examiners that the overriding concern in assessing an application is whether the proposed facility will comply with the 15,000 year no-escape standard of performance. *See* 30 TAC § 331.162. The Commission, however, concluded that HIFI had failed to show compliance with that performance standard.

HIFI intended to accept liquids containing hazardous waste and then solidify them with cement and fly ash to make a solid waste before injection; the Commission determined

that this process must be proven to work over time in order to meet the no-escape standard. *See id.* Ensuring that the waste is properly solidified is an overriding concern in this case. Because HIFI's experimental technology involves the *irretrievable* disposal of waste, no means exist to allow safe drainage of the caverns if the waste begins to leak. Coupled with potential disastrous health and environmental effects, HIFI's use of an experimental method caused the Commission justifiable concern.

The Commission, relying on test results included in HIFI's 1989 and 1992 applications, questioned the efficacy of the solidification process, the classification process, the possibility that gas and pressure would build up in the caverns, and the chain-of-custody proof for samples used in testing. Because of its concern in these four areas, the Commission concluded that HIFI presented insufficient assurance that (1) the waste will not migrate; (2) the solidification process will work on the full range of wastes and the wastes will remain solidified; (3) gas and pressure will not build in the caverns; and (4) the caverns would be set a safe distance from the edge of the salt stock.

After reviewing the evidence adduced during the hearing concerning these four issues, we conclude that the Commission did not err in overturning the examiners' findings on the solidification process, the possibility of gas and pressure build-up, and the importance of chain-of-custody evidence. We conclude, however, that the Commission erred in reversing the examiners' findings on classification of waste and holding that they were not supported by the great weight of the evidence. *See* 30 TAC § 331.166(a); *see also* 40 C.F.R. § 146.68(a) (1994) (requiring that all material injected into a well must be sampled and analyzed with an approved waste analysis plan).

---

17. The Commission argues that need is an ultimate finding of compliance with a statutory standard, which the Commission was permitted to overturn on the grounds of policy alone. *See* SWDA § 361.0832(e). Although we agree with the Commission that the determination of need is undoubtedly a policy question, the need issue is a statutory underlying finding used to determine

whether the ultimate statutory standard of "urgent public necessity" exists. *See* SWDA §§ 361.0832(c), 361.114(b)(2). Therefore, we agree with HIFI that the Commission could not overturn the PFD on policy grounds on the basis of need exclusively. Underlying findings cannot be used to overturn the Examiners' PFD on the basis of policy. SWDA § 361.0832(e).

The 15,000 year no-escape standard is a high burden for any applicant to satisfy. Although the Commission carefully scrutinized every aspect of HIFI's solidification process, we do not believe that the Commission was unduly technical in its review. Rather, the Commission was performing its statutorily mandated task: to protect public health and the environment by controlling the management of hazardous waste. SWDA § 361.002(b). The stakes in the hazardous waste permitting process are undeniably high, and the Commission has no choice but to require applicants to specifically satisfy all criteria of the Salt Dome Rules and the Solid Waste Disposal Act. In a different factual situation, the Commission perhaps could be more lenient in applying standards; in the context of hazardous waste disposal, there is no margin for error. To the extent that the evidence adduced at the hearing raised questions regarding need, the adequacy of the solidification process, and the attainment of the no-escape standard, the Commission did not err in denying the permits under the "urgent public necessity" and "public interest" criteria. SWDA § 361.114(b); Tex.Water Code Ann. §§ 27.051(a)(1), (g)(2) (West 1988 & Supp.1995).

### CONCLUSION

Because the permits at issue here involve an experimental approach to storage of hazardous waste, HIFI was subjected to rigorous requirements in the application process. The Commission did not err in reversing the examiners' findings on adequate characterization of the salt dome, public necessity, and public interest. Finding no error in the Commission's decision to deny the permits, we overrule HIFI's sole point of error, and affirm the judgment of the district court.