# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00860-CV

**Appellants, City of Jacksboro, IESI TX Landfill, LP and The Texas Commission on Environmental Quality// Cross-Appellant, Two Bush Community Action Group**

**v.**

**Appellee, Two Bush Community Action Group// Cross-Appellees, City of Jacksboro, IESI TX Landfill, LP and The Texas Commission on Environmental Quality**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 419TH JUDICIAL DISTRICT NO. D-1-GN-10-000211, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is a judicial review of an administrative order from the Texas Commission on Environmental Quality (TCEQ) granting a permit to IESI TX Landfill, LP to build and operate a municipal solid-waste landfill near Jacksboro, Texas. Two Bush Community Action Group brought this suit in Travis County district court seeking to reverse TCEQ's order granting the permit. The district court reversed a special provision included in the permit and remanded the case to TCEQ for further evidentiary proceedings regarding that special provision, and all parties now appeal from the district court's judgment. We will reverse the district court's order and render judgment affirming TCEQ's original order granting the permit.

## BACKGROUND

In 2005, the City of Jacksboro applied to TCEQ for a permit to build a municipal solid-waste landfill on property in southeast Jack County, Texas. IESI, the owner of the proposed site and the would-be operator of the landfill, later assumed the role of permit applicant as required by TCEQ rules. *See* 30 Tex. Admin. Code § 305.43(b) (2011) (Tex. Comm'n on Envtl. Quality, Who Applies). The proposed landfill, which would be thirteen miles from the City of Jacksboro and would serve approximately 171,000 people in the city and surrounding areas, would cover approximately 275 acres and operate for sixty years. Under the terms of the permit application, the landfill would accept household and putrescible waste, Class 2 industrial waste, Class 3 industrial waste, and special waste. *See* 30 Tex. Admin. Code §§ 330.3(22), (23), (64), (66), (119), (148) (2011) (Tex. Comm'n on Envtl. Quality, Municipal Solid Waste, Definitions).

TCEQ's executive director declared the permit application administratively and technically complete, then issued a preliminary decision to grant the permit in late 2006. Thereafter, Two Bush Community Action Group and some of its members submitted comments opposing the proposed permit and requesting a contested-case hearing on the application. TCEQ granted Two Bush's request for a contested-case hearing and referred the disputed issues to the State Office of Administrative Hearings.

After the contested-case hearing in October 2008, at which testimonial and documentary evidence was presented, the administrative law judge (ALJ) issued a proposal for decision (PFD) recommending that TCEQ deny IESI's permit application because IESI (1) "did not adequately identify and evaluate all springs and water wells within one mile of the proposed

2

facility's boundaries," (2) "did not identify an important regional aquifer," and (3) "did not properly identify the impact of the landfill on recharge areas within five miles of the site." According to the ALJ, the result of these omissions was that IESI "did not properly characterize the landfill's potential impact to groundwater resources in the [landfill] area."

The parties filed exceptions and replies to the PFD. Specifically, TCEQ's Office of Public Interest Counsel submitted a brief supporting the ALJ's recommendation to deny the permit; TCEQ's executive director submitted a response recommending that TCEQ overrule the PFD and remand for additional evidence regarding "whether additional groundwater monitoring wells are needed at the site"; and IESI filed a response opposing remand of the matter and instead offering, should TCEQ find that IESI's current groundwater-monitoring plan was deficient, to add twenty-eight groundwater-monitoring wells to the perimeter of the landfill site—this contingent offer by IESI is known as the "Special Provision."

After reviewing the parties' exceptions and replies, the ALJ issued an amended PFD. The amended PFD, although still finding that "IESI did not identify aquifers for the wells within one mile of the site, based on published sources," or identify areas of recharge, nevertheless recommended that TCEQ approve the permit if it included the Special Provision adding the extra groundwater-monitoring wells. The parties filed exceptions and responses to the amended PFD, but the ALJ declined to modify it. Accordingly, the amended PFD was set for consideration at a TCEQ public meeting.

After reviewing the amended PFD, hearing from parties' counsel, and questioning witnesses at the public meeting, the TCEQ Commissioners modified certain of the ALJ's findings

3

of fact and conclusions of law and then voted to issue the solid-waste permit as modified. The permit issued on November 2, 2009. The parties received notice of the order granting the permit on November 5, 2009. On November 25, Two Bush filed a motion for rehearing, which it later amended. Two Bush's motion for rehearing was subsequently overruled by operation of law when TCEQ failed to act on it.

Two Bush filed this suit against TCEQ in Travis County District court on January 19, 2010, seeking judicial review of TCEQ's order. IESI and the City of Jacksboro intervened in the case to defend the permit and later filed a joint plea to the jurisdiction, which asserted that Two Bush's motion for rehearing "was timely, but was legally insufficient to preserve any error for judicial review" and that Two Bush's amended motion for rehearing "was both untimely (and thus could not confer jurisdiction on [the district] court) and legally insufficient to preserve any error for judicial review." The district court denied the plea to the jurisdiction. After the case was submitted on briefs, the district court found that there was no evidence in the record regarding the Special Provision, reversed TCEQ's order granting the permit, and remanded the matter to TCEQ "to allow the parties to present evidence regarding" the Special Provision.

All parties appeal from the district court's judgment. IESI and the City of Jacksboro, but not TCEQ, challenge the district court's subject-matter jurisdiction over Two Bush's case based on Two Bush's motion for rehearing to TCEQ. IESI, the City of Jacksboro, and TCEQ together argue that the district court erred in reversing TCEQ's order because substantial evidence in the record supports TCEQ's addition of the Special Provision to the permit. On cross-appeal, Two Bush challenges the district court's failure to reverse and remand TCEQ's entire order. Specifically,

4

Two Bush asserts that (1) TCEQ's order was arbitrary because IESI's permit application did not comply with TCEQ's rules, (2) TCEQ's modifications to the ALJ's findings of fact and conclusions of law violate the Solid Waste Disposal Act, *see generally* Tex. Health & Safety Code Ann. §§ 361.001-.966 (West 2010), and (3) the ALJ abused her discretion in excluding evidence regarding IESI's "deficient groundwater characterization."

## JURISDICTION

We begin, as we must, by addressing IESI and the City of Jacksboro's contention that the district court lacked subject-matter jurisdiction over Two Bush's claims. *See Crites v. Collins*, 284 S.W.3d 839, 840 (Tex. 2009) (noting that jurisdictional questions must be addressed before merits). IESI and the City of Jacksboro argue that the district court lacked jurisdiction because (1) the administrative record admitted into evidence at the district court did not include a document showing that Two Bush's original motion for rehearing had been filed with TCEQ by the relevant statutory deadline, (2) even if Two Bush's original motion for rehearing was timely filed, its amended motion for rehearing, on which it based its claims, was filed after the statutory deadline and the Administrative Procedure Act, *see* Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008) (APA), does not allow amended motions for rehearing, and (3) Two Bush filed its case in the district court before its amended motion for rehearing was overruled by TCEQ or by operation of law.

### Standard of review

Whether a court has subject-matter jurisdiction is a question of law that we review de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

5

A trial court has jurisdiction to review the decision of an administrative agency only when provided by statute or when the agency decision adversely affects a vested property or constitutional right. *Continental Cas. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000). For purposes of jurisdiction in this case, the APA permits a party who has exhausted all of its administrative remedies and who is aggrieved by a final agency decision in a contested case to seek judicial review of the agency's decision. *See* Tex. Gov't Code Ann. § 2001.171; 30 Tex. Admin. Code § 80.275 (West 2011) (Tex. Comm'n on Envtl. Quality, Contested Case Hearings, Appeal of Final Decision) (providing that APA governs procedures for appealing TCEQ orders in contested cases). To exhaust its administrative remedies, a party must timely file a motion for rehearing with the agency. *See* Tex. Gov't Code Ann. § 2001.145(a); 30 Tex. Admin. Code Ann. § 80.272(b) (2011) (Tex. Comm'n on Envtl. Quality, Post Hearing Procedures) (providing that motion for rehearing is prerequisite to appeal). A motion for rehearing is timely if it is filed "not later than the 20th day after the date on which the party or the party's attorney of record is notified" of the agency's order. Tex. Gov't Code Ann. § 2001.146(a); 30 Tex. Admin. Code § 80.272(d)(1). If a party does not timely file a motion for rehearing, the trial court lacks subject-matter jurisdiction over a suit for judicial review of the agency's decision. *See Frank v. Liberty Ins. Corp.*, 255 S.W.3d 314, 320 (Tex. App.—Austin 2008, pet. denied); *Hill v. Board of Trs. of the Ret. Sys.*, 40 S.W.3d 676, 679 (Tex. App.—Austin 2001, no pet.) (concluding that "the timely filing of the motion for rehearing is jurisdictional because the filing of the motion for rehearing defines and restricts the kind of case a district court may hear—those in which the plaintiff has exhausted its administrative remedies and completed the administrative process"). To preserve error, the complaints in the motion for

6

rehearing must be sufficiently definite to apprise the agency of the claimed error so as to allow the agency opportunity to cure the claimed error or to prepare to defend the order. *See Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 365 (Tex. 1983). Unless "the motion for rehearing is so indefinite, vague, and general as to constitute no motion for rehearing at all," however, the inadequacy or insufficiency of the contents of the motion are not "jurisdictional and go solely to the issue of preservation of error." *See Hill*, 40 S.W.3d at 679.

**Administrative record**

TCEQ issued its order granting the permit on November 2, 2009, and mailed copies of that order to the parties' attorneys of record. The undisputed evidence admitted at trial and Two Bush's stipulation show that Two Bush's attorney received a copy of TCEQ's order on November 5, 2009. Thus, under the plain language of the APA, which requires that a motion for rehearing be filed "no later than the 20th day after the date on which the party or party's attorney of record is notified" of the order from which it is appealing, Two Bush's motion for rehearing had to be filed with TCEQ by November 25, 2009. *See* Tex. Gov't Code Ann. § 2001.146(a).[1]

---

[1] Two Bush and TCEQ argue that APA section 2001.142(c)'s provision that a party notified of an agency order by mail is "presumed" to have received the notice three days after the notice was mailed means that Two Bush's motion for rehearing was not due until November 30, 2009—or November 5 plus the three day presumption, plus the twenty days to file, and taking into account the Thanksgiving holiday on November 26-27, 2009. *See* Tex. Gov't Code Ann. § 2001.142(c) (West 2008). A presumption, however, "is simply a rule of law requiring the trier of fact to reach a particular conclusion in the *absence* of evidence to the contrary . . . . The presumption disappears when evidence to the contrary is introduced." *Temple Indep. Sch. Dist. v. English*, 896 S.W.2d 167, 169 (Tex. 1995) (emphasis added) (internal citations omitted). Here, Two Bush's attorney stipulated that she *actually* received the notice on November 5, 2009.

7

All parties to this appeal, including IESI in its argument and briefing to the district court and to this Court, agree that Two Bush faxed its motion for rehearing to TCEQ on November 25, 2009, which was the Wednesday before the Thanksgiving holiday. Further, TCEQ has since provided this Court, pursuant to an unopposed motion to correct the record, *see* Tex. R. App. P. 36.3, with a certified copy of Two Bush's motion showing that it was faxed to and received by TCEQ's Chief Clerk's Office on November 25, 2009.[2] The purported problem, however, is that the copy of this same motion for rehearing that was offered and admitted into evidence at the district court has a date stamp of November 30, 2009.[3] IESI contends on appeal that because the motion for rehearing that was admitted into evidence at the district court is date-stamped November 30, 2009, the trial court lacked subject-matter jurisdiction over Two Bush's suit for judicial review. We disagree.

Whether a trial court has jurisdiction over a case depends initially on the plaintiff's pleadings. *See Miranda*, 133 S.W.3d at 226; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). The plaintiff must plead enough facts to affirmatively demonstrate that the trial court has subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 226. The defendant may file a plea to the jurisdiction challenging plaintiff's pleading if the defendant believes that the pleading

---

[2] Although IESI did not oppose TCEQ's motion to correct the administrative record by adding the November 25, 2009, date-stamped copy of the motion for rehearing to the appellate record, it maintains that the correction does not cure Two Bush's failure to offer the November 25 file-stamped motion into evidence at the district court.

[3] At oral argument, TCEQ's counsel explained to this Court that TCEQ's practice when receiving a faxed document is to date stamp the faxed copy when it is received, but when the required original arrives at TCEQ, it is date stamped again. Only that original date-stamped document is included in the administrative record.

is jurisdictionally deficient. *See id.* Here, IESI did not challenge Two Bush's pleadings on jurisdictional grounds. Nevertheless, we note that Two Bush's pleading asserts, among other relevant matters, that Two Bush timely filed a motion for rehearing of TCEQ's order and that motion was overruled by operation of law. Thus, Two Bush's pleadings were sufficient to affirmatively demonstrate the district court's subject-matter jurisdiction. *See id*. at 227.

In addition to challenging jurisdiction based on a plaintiff's pleadings, however, a party may also raise a jurisdictional issue by challenging the existence of a jurisdictional fact. *See id.* at 226-27 (describing two types of jurisdictional challenges). In other words, even if plaintiff's pleadings are sufficient to establish jurisdiction, there may be underlying facts that affect the court's subject-matter jurisdiction and the defendant may challenge those facts in a plea to the jurisdiction. When that is done, the reviewing court must consider "relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do." *Id.* at 227. But IESI did not, and does not now, challenge the existence a jurisdictional fact—e.g., that Two Bush *actually* filed its original motion for rehearing on November 25, 2009.[4] Rather, IESI challenges Two Bush's failure to offer and have admitted into evidence a November 25, 2009, copy of its motion for rehearing. But that failure is not a jurisdictional fact.

Jurisdictional facts are facts that relate to whether jurisdiction exists—e.g., whether the plaintiff timely filed a motion for rehearing in an administrative case, whether the Department of Parks & Wildlife was aware of a dangerous condition sufficient to waive sovereign immunity in a

---

[4] In fact, IESI's plea to the jurisdiction asserts that Two Bush "filed a timely, yet wholly inadequate, Motion for Rehearing."

case against a state agency, *see Miranda*, 133 S.W.3d at 230-31, and whether the value of property is correct as it relates to the amount in controversy, *see Delk v. City of Dallas*, 560 S.W.2d 519, 520 (Tex. Civ. App.—Texarkana 1977, no writ). But whether a party has proven an undisputed jurisdictional fact is not itself a jurisdictional fact. Stated a different way, it was Two Bush's filing of a motion for rehearing on November 25, 2009, that conferred subject-matter jurisdiction on the district court, not whether Two Bush subsequently put into the district court's record a copy of the motion date-stamped November 25, 2009, because subject-matter jurisdiction either exists or it does not. Once subject matter jurisdiction undisputedly exists, it cannot subsequently be lost by a party's failure to include documentary evidence of the undisputed jurisdictional fact. Thus, in the absence of an assertion that the district court lacked subject-matter jurisdiction because of either a pleading deficiency or because of a challenge to a jurisdictional fact with supporting evidence, a party is not required to produce evidence supporting the jurisdictional assertions in its pleadings. *See Miranda*, 133 S.W.3d at 227-28. Accordingly, because Two Bush pleaded facts sufficient to affirmatively demonstrate the district court's subject-matter jurisdiction, because IESI has not challenged Two Bush's pleadings or its alleged jurisdictional facts, and, most importantly, because it is undisputed that Two Bush filed a timely motion for rehearing, it was not necessary for Two Bush to produce evidence supporting its jurisdictional assertions. Thus, its failure to include documentary evidence of the timely filing did not affect the district court's subject-matter jurisdiction.

To the extent that IESI's issue on appeal could be construed as a challenge to the existence of a jurisdictional fact affecting this Court's jurisdiction, *see Texas Emp't Comm'n v. International Union of Elec., Radio & Mach. Workers, Local Union No. 782*, 352 S.W.2d 252, 253

10

(Tex. 1961) (holding that subject-matter jurisdiction is an issue that may be raised for the first time on appeal), TCEQ has submitted unchallenged evidence to this Court confirming that Two Bush faxed a motion for rehearing to TCEQ on November 25, 2009. *See* Tex. Gov't Code Ann. § 22.220 (West Supp. 2011) (providing that appellate courts may "ascertain matters of fact that are necessary to the proper exercise of its jurisdiction"); *Glidden Co. v. Aetna Cas. & Sur. Co.*, 291 S.W.2d 315, 317 (Tex. 1956). Further, we note that at the hearing on IESI's plea to the jurisdiction, the district court admitted into evidence a copy of TCEQ's administrative docket for this case. That exhibit, which is a hard copy of "TCEQ's Chief Clerk's Database" from TCEQ's website, shows that TCEQ received a motion for rehearing on November 25, 2009. Under the circumstances here—i.e., IESI conceding in its pleadings and acknowledging to the district court that Two Bush filed a motion for rehearing on November 25, 2009—this is some evidence that Two Bush filed a timely motion for rehearing with TCEQ. Accordingly, the district court and this Court have subject-matter jurisdiction over this case.

**Amended motion for rehearing**

In a related argument, IESI asserts that even if Two Bush's original motion for rehearing was timely, the district court nevertheless lacked subject-matter jurisdiction over Two Bush's claims because those claims were based on an amended motion for rehearing that was filed after the November 25, 2009, deadline and the APA does not allow a party to amend motions for rehearing after the filing deadline. In support of its argument, IESI relies on opinions from this Court holding that the APA does not permit a party to file an amended motion for rehearing after the filing deadline. *See Snead v. Texas State Bd. of Med. Exam'rs*, 753 S.W.2d 809, 811

11

(Tex. Civ. App.—Austin 1988, no writ); *see also Anderson v. Railroad Comm'n*, 963 S.W.2d 217, 219 (Tex. App.—Austin 1998, pet. denied) (citing to *Snead* for proposition that the "APA makes no provision for amending a motion for rehearing after the filing deadline"). But whether the APA allows a party to file an amended motion for rehearing does not affect the district court's subject-matter jurisdiction over Two Bush's claims. It was Two Bush's timely filing of a motion for rehearing that conferred subject matter jurisdiction on the district court. *See* Tex. Gov't Code Ann. § 2001.145 (timely filed motion for rehearing is prerequisite for jurisdiction); 30 Tex. Admin. Code § 80.272(b) (same). That Two Bush also filed an amended motion that may or may not be permitted under the APA does not change the existence of that jurisdictional fact. At most, the filing of an amended motion for rehearing, depending on the sufficiency or adequacy of the original motion for rehearing, may affect preservation-of-error considerations. *See Hill*, 40 S.W.3d at 679 (holding that unless "the motion for rehearing is so indefinite, vague, and general as to constitute no motion for rehearing at all," the inadequacy or insufficiency of the contents of the motion are not "jurisdictional and go solely to the issue of preservation of error"). IESI does not challenge whether Two Bush preserved error, but only whether the district court had jurisdiction.

**Time for filing suit for judicial review**

In its remaining jurisdictional challenge, IESI and the City of Jacksboro argue that the district court lacked jurisdiction over this case because Two Bush filed suit before the amended motion for rehearing was overruled by operation of law. IESI bases this argument on APA section 2001.146(f), which provides that a motion for rehearing is overruled by operation of law on

the 90th day after notice of the order if the agency granted an extension to file the motion for rehearing or response:

> *In the event of an extension*, a motion for rehearing is overruled by operation of law on the date fixed by the order or, in the absence of a fixed date, 90 days after the date on which the party or the party's attorney of record is notified [of the agency's order].

Tex. Gov't Code Ann. § 2001.146(f) (emphasis added). IESI argues that when TCEQ granted Two Bush's request for an extension of time to file an amended motion for rehearing, that triggered this APA provision, such that Two Bush's motion for rehearing was not overruled by operation of law until February 5, 2010—i.e., 90 days after November 5, 2009, or the date the parties received notice of TCEQ's order granting the permit. Thus, IESI argues, Two Bush's suit for judicial review, which was filed on January 19, 2010, was filed before the district court could have had subject-matter jurisdiction over this matter. We disagree.

As discussed, this Court has previously held that the APA does not allow a party to file an amended motion for rehearing after the filing deadline. *See Snead*, 753 S.W.2d at 811. Here, the request for an extension of time, the purported grant of that extension, and the filing of the amended motion all occurred after the filing deadline. If the APA does not allow a party to amend a motion for rehearing after the filing deadline, then it follows that it would not allow an agency to grant a request to extend the filing deadline that was made after the deadline passed. Accordingly, the APA provision allowing an agency to extend motion-for-rehearing deadlines was not triggered. Thus, Two Bush's motion for rehearing was overruled by operation of law on "the 45th day after the date on which the party or the party's attorney of record [was] notified"—i.e., December 20, 2009.

13

*See* Tex. Gov't Code Ann. § 2001.146(c); *see also Jones v. State Bd. of Educator Certification*, 315 S.W.3d 237, 239 (Tex. App.—Austin 2010, pet. denied).

We overrule IESI's and the City of Jacksboro's challenges to the district court's jurisdiction.

## TCEQ'S ORDER

We now turn to the substantive challenges to TCEQ's order—i.e., IESI, the City of Jacksboro, and TCEQ's contention that the district court erred in reversing the special provision, and Two Bush's contention that the district court erred by not reversing TCEQ's entire order. The parties agree that APA section 2001.174 governs our review of these issues. This standard requires that we reverse or remand a case for further proceedings "if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions" are

    (A)    in violation of a constitutional or statutory provision;

    (B)    in excess of the agency's statutory authority;

    (C)    made through unlawful procedure;

    (D)    affected by other error of law;

    (E)    not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

    (F)    arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174(2). However, we may not substitute our judgment for that of the agency's on the weight of the evidence on matters committed to agency discretion. *See Southwestern*

14

*Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied). With respect to subparagraph (E), "substantial evidence" does not mean a large or considerable amount of evidence, but such relevant evidence as a reasonable mind might accept as adequate to support a conclusion of fact. *Pierce v. Underwood*, 487 U.S. 552, 564-65 (1988); *Lauderdale v. Texas Dep't of Agric.*, 923 S.W.2d 834, 836 (Tex. App.—Austin 1996, no writ). The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action. *Railroad Comm'n v. Pend Oreille Oil & Gas Co., Inc.*, 817 S.W.2d 36, 41 (Tex. 1991). We must uphold an agency's finding even if the evidence actually preponderates against it, so long as enough evidence suggests the agency's determination was within the bounds of reasonableness. *Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215.

**Solid-waste permitting process**

Before we address the substantive issues on appeal, a general understanding of the solid-waste permitting process, and specifically the groundwater-monitoring requirement of TCEQ rules, is helpful. The Solid Waste Disposal Act provides that its purpose, and this State's policy, "is to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste . . . ." *See* Tex. Health & Safety Code Ann. § 361.002. The Legislature has conferred on TCEQ the responsibility for carrying out this purpose and the authority to promulgate rules to meet this legislative directive. *See id.* § 361.011.

The rules promulgated by TCEQ pursuant to this grant of authority require parties seeking to build or operate a solid-waste landfill to submit to TCEQ a detailed application for a solid-waste permit and notify all persons potentially affected by the request. *See generally*,

30 Tex. Admin. Code § 330.51 (2005) (Tex. Comm'n on Envtl. Quality, Permit Application for Municipal Solid Waste Facilities).[5] Among other required information, the permit application must include a site development plan that provides "a detailed design with supporting calculations and data for the development and operation of a solid waste site." *See id.* §§ 330.2(130) (Tex. Comm'n on Envtl. Quality, Definitions) (definition of "site development plan"), 330.55 (Tex. Comm'n on Envtl. Quality, Site Development Plan) (requiring site development plan). For example, to assist TCEQ in determining whether the proposed landfill is compatible with existing land uses or whether it would adversely affect the environment, the application must include information regarding "all known wells within 500 feet of the site," *see id.* § 330.53 (Tex. Comm'n on Envtl. Quality, Technical Requirements of Part II of the Application), and "a description of regional aquifers in the vicinity of the facility based upon published and open-file sources," *see id.* § 330.56(d)(4) (Tex. Comm'n on Envtl. Quality, Attachments to the Site Development Plan). The site development plan must also include a geology report with information regarding the soils and hydrogeology of the proposed landfill site that, generally stated, identifies whether groundwater is present and where it flows. *See id.* § 330.56(d)-(e). This information is used, in turn, to develop a groundwater-monitoring system "that consists of a sufficient number of monitoring wells, installed at appropriate locations and depths, to yield representative groundwater samples from the uppermost aquifer" at the site. *See id.* § 330.231(a) (Tex. Comm'n on Envtl. Quality, Groundwater Monitoring

---

[5] The City of Jacksboro submitted the application at issue here to TCEQ in 2005. Accordingly, TCEQ found in its order that the application was subject to administrative rules in effect at that time. Unless otherwise indicated, references to Chapter 330 of TCEQ's rules are to those rules in effect in 2005.

16

Systems).[6]   After an applicant provides all the required information to TCEQ and after the application goes through the permitting process, which may include a contested-case hearing, TCEQ reviews the application to determine whether it complies with the relevant statutes and rules and then issues an order to reflect that determination.  *See generally id.* §§ 50.2-.145 (2011) (Tex. Comm'n on Envtl. Quality, Action on Applications and Other Authorizations).

**The Jacksboro landfill**

At the contested-case hearing, IESI presented evidence about the geological and hydrological status of the proposed landfill site.  The evidence was in the form of IESI's permit application, reports, and expert testimony and included data collected from the proposed site and conclusions from expert analysis of that data.  Specifically, but stated generally, IESI's experts concluded that there are three principal geologic units underneath the Jacksboro landfill site: Stratum I, Stratum II, and Stratum III, with Stratum I having "interbeds of sandstone and siltstone" that the experts identified as Stratum IA.  According to the evidence and testimony, Stratum II roughly corresponds in geological terms to the Twin Mountain formation in the Trinity Group of the Cretaceous system, and Stratum III roughly corresponds to the Canyon group of the Pennsylvanian system, which underlies the Cretaceous system.

---

[6] Monitoring wells intercept groundwater as it flows off-site from beneath the landfill.  *See generally* 30 Tex. Admin. Code § 330.231 (2005) (Tex. Comm'n on Envtl. Quality, Groundwater Monitoring Systems).  Generally speaking, the wells from which samples are taken are located upgradient and downgradient—similar to upstream and downstream respectively.  The samples collected from the downgradient wells are compared to the samples that were taken upgradient of the landfill—i.e., before the water flowed under the landfill—to determine whether leachate from the landfill contaminated the groundwater as it flowed under the landfill.

IESI's experts testified that Stratum II—referred to as the Trinity or Twin Mountain formation—which they identified as the main water-bearing stratum, was the regional aquifer underlying the proposed landfill site and that its groundwater "flows generally to the north-northeast." *See* 30 Tex. Admin. Code §§ 330.2(6) (defining "aquifer" as a geological formation "capable of yielding significant quantities of groundwater"), 330.56(d)(4) (requiring identification of regional aquifers, including information regarding groundwater flow). They testified that Stratum IA contains discontinuous pockets of water, but that its limited water was confined within the boundaries of the site by an impermeable layer of clay. They also asserted that Stratum IA is not an aquifer because its pockets of water were not significant and would not yield usable quantities of groundwater that would require monitoring. *See id.* They noted further that Stratum IA would be "almost completely" excavated during the landfill's construction. Although IESI's experts acknowledged that Stratum IA extended past the boundaries of the proposed landfill site, they nevertheless concluded this was not a permitting issue because any water in Stratum IA would not migrate. They concluded that any contaminant escaping from the bottom of the landfill would slowly make its way through the upper parts of Stratum II. Finally, they concluded that Stratum III was an aquiclude beneath the site such that it confined the water in Stratum II to Stratum II.[7] Based on these conclusions—i.e., that Stratum II was the uppermost aquifer, that any water in Stratum IA would not migrate, and that Stratum III was an aquiclude beneath the site—IESI's experts testified that it was only necessary to monitor Stratum II to protect the groundwater. Thus, the groundwater-

---

[7] "Aquiclude" is not defined in TCEQ rules, but it is commonly defined as "a geologic formation or stratum that confines water in an adjacent aquifer." *See Webster's Third New International Dictionary* 108 (2002).

monitoring plan presented as part of IESI's permit application—i.e., without the Special Provision—monitors Stratum II only. *See id.* § 330.231(a) (requiring groundwater-monitoring system only for uppermost aquifer).

The testimony and evidence presented by IESI at the contested-case hearing showed that IESI's proposed groundwater-monitoring system included nine wells completed downgradient in Stratum II and two wells completed upgradient in Stratum II. IESI's experts also testified about the specifics of the monitoring system, the data they had collected and studied regarding the groundwater, their various conclusions regarding those samples, their opinions regarding the effect of the landfill on the groundwater, and whether IESI's ground-water monitoring system provided the groundwater protection required by TCEQ rules. They concluded that it did.

Two Bush's experts disagreed. Namely, they asserted that IESI had failed to identify all the nearby water wells that could be affected by the landfill and that IESI had mischaracterized or misinterpreted the data from the site and the geological formations underlying the site, including the direction of the flow of groundwater. Two Bush offered evidence, acquired by conducting a door-to-door survey, that there were additional wells within the vicinity of the proposed landfill site that IESI had failed to identify. Two Bush's experts testified that contaminants would be able to escape from the landfill into the Stratum IA sands, past the Stratum II wells, such that IESI should be required to install monitoring wells in Stratum IA.

Two Bush's experts also challenged IESI's conclusion that the Twin Mountain formation of the Cretaceous system was the only regional aquifer and argued that IESI had failed to identify the Canyon group of the Pennsylvania system, which underlies the Cretaceous system.

Specifically, the experts argued that water wells in the vicinity of the proposed site were completed in the Canyon group of the Pennsylvanian system and further that groundwater from Stratum II could flow into Stratum III at some point. Thus, the experts argued, the Canyon group was hydraulically connected to the Stratum II aquifer and, as such, was required to be identified by TCEQ rules. *See* 30 Tex. Admin. Code § 330.56(d)(4)(E). The bottom line being that, in Two Bush's opinion, IESI had failed to provide all the information required by TCEQ rules and that its proposed monitoring system was not sufficient to adequately protect the groundwater in the vicinity of the proposed landfill site.

After the ALJ agreed with Two Bush in the initial PFD that IESI had not adequately identified nearby wells and recommended that TCEQ deny the permit for that reason, IESI responded that it was "reluctantly willing to accept a Special Provision requiring monitoring wells in Stratum IA all around the perimeter of the landfill placed and designed according to TCEQ rules and the requirements established during the record of [the contested-case hearing] for other monitoring wells." IESI enclosed a pleading attachment that listed the details for 28 additional groundwater-monitoring wells around the perimeter of the site to be screened in Stratum IA. TCEQ's subsequent order granting the permit added the Special Provision.[8] The district court, as

---

[8] The Special Provision in TCEQ's order states:

In addition to the groundwater monitoring wells in Attachment 5 to the application that will monitor groundwater in the uppermost aquifer (Stratum II), 28 additional monitoring wells shall be installed within the Stratum I and I-A interval as shown in the Attached Special Provisions Table No. 1. The wells will be installed in accordance with the monitoring well details described in Part III, Attachment 5, of the application and will be sampled in accordance with the Groundwater Sampling and Analysis Plan in Attachment 11 and in accordance with 30 TEX. ADMIN. CODE §§ 330.230 through 330.238 and §§ 330.240 through 330.242.

discussed, subsequently reversed TCEQ's addition of the special provision on the ground that there was no evidence of the Special Provision.

**The Special Provision**

IESI, TCEQ, and the City of Jacksboro challenge the district court's finding that there is no evidence in the record regarding the Special Provision—i.e., the provision TCEQ added to the permit that requires IESI to install, in addition to the groundwater-monitoring wells for Stratum II included in its permit application, 28 wells around the perimeter of the landfill to monitor the groundwater in Strata I and IA. IESI, TCEQ, and the City argue that TCEQ has the authority to add special provisions to the permits it grants and that the substantial evidence in the record supports the adoption of the Special Provision added to IESI's permit. Two Bush argues in support of the district court's judgment that there is no evidence in the record regarding the Special Provision because IESI did not raise the possibility of adding this provision to its permit application until after the ALJ closed the evidence at the contested-case hearing. This absence of evidence, Two Bush argues, mandates that we reverse TCEQ's order on the ground that it is not reasonably supported by substantial evidence. *See* Tex. Gov't Code Ann. § 2001.174(2)(E). We disagree.

Two Bush is correct that IESI did not raise the possibility of adding the Special Provision to its groundwater-monitoring plan until after the ALJ submitted her initial PFD, and thus had not formally introduced the Special Provision into the evidence of the contested-case hearing. But our task here is to review TCEQ's order to determine whether its "administrative findings, inferences, conclusions, or decisions . . . are reasonably supported by substantial evidence considering the reliable and probative *evidence in the record as a whole*." *See id*. § 2001.174(2)(E)

21

(emphasis added); *Exxon Corp. v. Railroad Comm'n*, 993 S.W.2d 704, 709 (Tex. App.—Austin 1999, no pet.) (noting that we review the administrative agency's order and not the PFD).  Thus, our substantial-evidence review encompasses not only the evidence admitted during the contested-case hearing before the ALJ, but also "the record as a whole."  *See Exxon Corp.*, 996 S.W.2d at 709-10 (holding that "the record as a whole" is the object of judicial review in substantial-evidence questions).

The APA provides that the record in a contested case includes the following:

(1) each pleading, motion, and intermediate ruling;
(2) evidence received or considered;
(3) a statement of matters officially noticed;
(4) questions and offers of proof, objections, and rulings on them;
(5) proposed findings and exceptions;
(6) each decision, opinion, or report by the officer presiding at the hearing; and
(7) all staff memoranda or data submitted to or considered by the hearing officer or members of the agency who are involved in making the decision.

Tex. Gov't Code Ann. § 2001.060; *see also id.* § 2001.003(1) (defining "contested case" as "a proceeding, including a . . . licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing").  IESI raised the issue of adding additional groundwater-monitoring wells in its exceptions to the ALJ's original PFD and attached a copy of the Special Provision to that document.  Further, as indicated by the amended PFD, the ALJ considered the Special Provision in reaching her findings of fact and conclusions of law in the amended PFD.  Thus, the Special Provision was part of the "record as a whole" in this case.  *See id.* § 2001.060(1), (2), (5), (6).

22

Even if we were to assume that the record here contains no evidence regarding the Special Provision, however, we may only reverse TCEQ's decision on substantial-evidence grounds if Two Bush's "*substantial rights . . .* have been prejudiced." *See id.* § 2001.174(2) (emphasis added). But Two Bush does not explain how or show which, if any, of its substantial rights were prejudiced by TCEQ's addition of the Special Provision to the application and, more importantly, we cannot see that any of its rights were prejudiced.

Under TCEQ rules, a landfill operator is required to install a groundwater-monitoring system that "consists of a sufficient number of monitoring wells, installed at appropriate locations and depths, to yield representative groundwater samples from the uppermost aquifer." *See* 30 Tex. Admin. Code § 330.231(a). The rules define "aquifer" as a "geological formation, group of formations, or portion of a formation capable of yielding significant quantities of groundwater to wells or springs," *id.* § 330.2(6), and an "uppermost aquifer" as the "geologic formation nearest the natural ground surface that is an aquifer; [this] includes lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary," *id.* § 330.2(158). Thus, TCEQ rules require that a solid-waste landfill have a groundwater-monitoring system that monitors the highest geological formation underneath the landfill that is capable of yielding significant quantities of groundwater.

As discussed above, IESI presented evidence that Stratum II was the highest geological formation underneath the landfill that was capable of producing significant quantities of groundwater. IESI presented further evidence that Strata I and IA contained only discontinuous water that was not susceptible to lateral migration and that Strata I and IA were not aquifers because

their pockets of water were not significant and would not yield usable quantities of groundwater. TCEQ agreed with this evidence, finding that Stratum IA was "discontinuous and uncorrelateable across the site" and that water in Stratum IA was "contained at discontinuous points." Regarding Stratum II, TCEQ found that it was the only regional aquifer and that its groundwater flows to the north-northeast. Thus, pursuant to rules' definitions of aquifer and uppermost aquifer, the evidence shows and TCEQ's findings indicate that Stratum II was the uppermost aquifer underneath the site—i.e., the only aquifer that requires groundwater monitoring under the rules. *See id.* § 330.231(a). Accordingly, TCEQ concluded that IESI had met its burden with respect to all referred issues, that the permit to be issued met all the requirements of the Solid Waste Disposal Act and TCEQ rules, and that the groundwater sampling and analysis plan—i.e., the plan included by IESI with its application—met the groundwater-monitoring requirements of TCEQ rules. Stated another way, IESI's groundwater-monitoring system as originally submitted, without the additional monitoring from the Special Provision, complied with rule 330.231(a)—i.e., the rule specifying the requirements for groundwater monitoring.

The fact that TCEQ also agreed with some of Two Bush's evidence—e.g., that leachate may migrate off-site in Stratum IA, that there were usable amounts of groundwater within one mile of the landfill site, and other Stratum IA-monitoring concerns—did not change the fact that IESI's original plan monitored the uppermost aquifer—i.e., Stratum II—which is all the TCEQ groundwater-monitoring rules require. Likewise, the addition of the Special Provision—which added extra groundwater-monitoring wells for Stratum IA beyond those required by the rules—did not change the fact that the original plan monitored the groundwater as required by the rules; rather,

24

IESI added, and TCEQ approved, these additional wells to address Two Bush's concerns regarding Stratum IA. In sum, the TCEQ permit at issue here not only meets the rules' requirements that groundwater from the uppermost aquifer be monitored, as it must, but it also provides for extra monitoring of groundwater that the evidence shows is not in the uppermost aquifer. Refusing to accept "yes" for an answer, however, Two Bush complains that its substantial rights have been prejudiced by the addition of the extra groundwater-monitoring wells for Stratum IA. We cannot see, however, how Two Bush has been harmed by TCEQ's adopting a permit that provides more groundwater monitoring than is required by the rules. *See North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 448 (Tex. App.—Austin 1992, writ denied).

Two Bush also asserts that without evidence regarding the Special Provision there is no way to ensure that the Special Provision's groundwater-monitoring system conforms to TCEQ rules. *See, e.g.*, 30 Tex. Admin. Code § 330.231(e)(1) (requiring design of groundwater-monitoring system be based on site specific technical information). This argument relies on the incorrect assumption, as discussed above, that IESI's original groundwater-monitoring plan does not conform to TCEQ's groundwater-monitoring rules. Although Two Bush argues that the presence of groundwater beneath the proposed site was a "hotly contested issue" in the contested-case hearing, the bottom line is that TCEQ classified Stratum II as the only regional aquifer, and thus that Stratum I and IA are not aquifers and do not require monitoring. Whether the Special Provision conforms to TCEQ rules regarding monitoring the uppermost aquifer is not a relevant inquiry here.

Two Bush suggests that inclusion of the Special Provision was the "sole basis" of TCEQ's decision to grant the permit because TCEQ determined that the permit should issue "only

25

if" the Special Provision was included. But this argument mischaracterizes TCEQ's order. The order provides, for example, that "With the addition of the Special Provision, [TCEQ]'s application complies with" the provisions of the Solid Waste Disposal Act and TCEQ rules. The order does not, however, provide that "only with" the addition of the Special Provision will the application comply. Accordingly, Two Bush's argument is without merit.

Two Bush complains that its rights were prejudiced because it had no opportunity to scrutinize the groundwater-monitoring plan set forth in the Special Provision. The record reflects that it did have the opportunity to examine the plan, but even if we assume that it did not, the additional groundwater monitoring provided by the Special Provision exceeds the groundwater monitoring required under the rules—i.e., monitoring of the uppermost aquifer. Again, we cannot see how Two Bush's rights were prejudiced by the addition of extra groundwater-monitoring wells to monitor a stratum that is not required to be monitored. And TCEQ has the authority—under the APA, its own rules, and opinions from this Court, *see* Tex. Gov't Code Ann. §§ 2001.060, .062(d); 30 Tex. Admin. Code § 80.259 (2011) (Tex. Comm'n on Envtl. Quality, Post Hearing Procedures); *Citizens Against Landfill Location v. Texas Comm'n on Environmental Quality*, 169 S.W.3d 258 (Tex. App.—Austin 2005, pet. denied)—to add special provisions to municipal-solid-waste permits after the evidentiary hearing has concluded so long as the decision to add the special provisions does not prejudice substantial rights.

Finally, Two Bush Argues that even if the Special Provision had been admitted into evidence, it does not address the "fundamental problems that the ALJ identified in her PFD—problems associated with IESI's failure to prove what direction the groundwater flows in

26

Stratum II and IESI's failure to acknowledge the water wells surrounding the proposed landfill site."

Although our task here is to review TCEQ's order and not the PFD, *see Exxon Corp.*, 993 S.W.2d at 109 (noting that "we review the Commissioners' findings of facts and conclusions of law, not those recommended by the examiner in this proposal for decision"), we note that IESI did not "fail to prove" in what direction the Stratum II groundwater flowed. Rather, IESI presented documentary and testimonial evidence at the contested-case hearing that the groundwater in Stratum II flowed north-northeast and TCEQ agreed in its findings of fact. Without commenting on the weight of the evidence here, we simply note that the record contains relevant evidence regarding Stratum II groundwater flow that a reasonable mind could accept as supporting TCEQ's conclusion that the flow was north-northeast. *See Southwestern Pub. Serv. Co.*, 962 S.W.2d at 215 (holding that we must uphold an agency's finding even if the evidence actually preponderates against it, so long as enough evidence suggests the agency's determination was within the bounds of reasonableness); *Lauderdale*, 923 S.W.2d at 836.

Absent prejudice to Two Bush's substantial rights, reversal of TCEQ's order based on the addition of the Special Provision is unwarranted. Accordingly, we sustain IESI, the City of Jacksboro, and TCEQ's issue on this matter.

**Permit**

On cross-appeal, Two Bush argues that TCEQ's decision to grant the permit was arbitrary and capricious because "(1) TCEQ failed to follow its own rules[] requiring specific and accurate information regarding groundwater; (2) TCEQ's findings of fact are not rationally

27

connected to its decision [to grant the permit]; and (3) several of TCEQ's findings are not supported by the evidence." We disagree with each of these contentions.

Chapter 330 of the Texas Administrative Code requires a solid-waste permit applicant to investigate the groundwater in the area of the proposed landfill site and to provide a report to TCEQ detailing the investigation and characteristics of the area's geology. *See, e.g.*, 30 Tex. Admin. Code §§ 330.56(d) (requiring description of local aquifers, subsurface water investigation report, and a groundwater investigation report), 330.231 (requiring groundwater-monitoring system based on site-specific technical information). Two Bush contends that TCEQ's decision to grant the permit to IESI was arbitrary and capricious in light of the fact that it found that IESI had failed to meet certain of these regulatory requirements. Two Bush makes specific reference to IESI's failure to "adequately and accurately investigate[] and identif[y] the presence of groundwater (*i.e.*, aquifers) underneath the proposed site[] in accordance with TCEQ regulatory requirements." *See id.* § 330.56(d)(4) (requiring applications to include "a description of the regional aquifers in the vicinity of the facility based upon published and open-file sources"). As discussed in more detail below, we do not agree that IESI failed, or that TCEQ found that IESI had failed, to meet the regulatory requirements.

The crux of Two Bush's argument here lies in IESI's identification of the Twin Mountain formation as the only regional aquifer in the vicinity of the proposed landfill and IESI's related identification of the underlying Pennsylvanian system as an aquiclude rather than an aquifer. Two Bush presented testimony that the Pennsylvanian is an aquifer and that IESI's application should have included additional information about and protection of the Pennsylvanian

28

system. On appeal, Two Bush argues that TCEQ agreed that the Pennsylvanian was an aquifer, relying on TCEQ's finding that the "Pennsylvanian formation is a critically important source of useable groundwater in the vicinity of the landfill." This finding, Two Bush asserts, means that the Pennsylvanian system is an aquifer, not an aquiclude, and that IESI should have included in its application all the additional required information regarding that aquifer, including a plan to monitor its groundwater. Thus, because the application did not do this, Two Bush argues, it was arbitrary and capricious for TCEQ to grant the permit.

We note initially that the presence of groundwater does not alone render a geological formation an aquifer. Under TCEQ rules, an aquifer is defined as a geological formation "capable of yielding *significant* quantities of groundwater." *See id.* § 330.2(6). Logically then, a geological formation yielding less than *significant* quantities of groundwater is not an aquifer under the rules. Thus, TCEQ's finding that the Pennsylvanian system or Stratum III contains groundwater and, likewise, its finding that the Pennsylvania formation is an important source of "useable groundwater" in the vicinity of the landfill, does not necessarily render it an aquifer under TCEQ rules. More importantly, TCEQ did not find that the Pennsylvanian formation was a regional aquifer. TCEQ did, however, identify the Twin Mountain formation—i.e., Stratum II—as the regional aquifer, and IESI's application included the required information regarding the Twin Mountain formation. Thus, TCEQ's findings do not conflict with its decision to grant the permit.

We note also that IESI's identification of the Pennsylvanian system as an aquiclude does not, as Two Bush's brief suggests, imply that IESI determined that the Pennsylvanian system is incapable of producing groundwater. "Aquiclude" is a term used to describe a geological

29

formation that acts a as a barrier or, more precisely, "confines water in an adjacent aquifer." *See*

*Webster's Third New Int'l Dictionary* 108 (2002). As IESI's expert explained, the fact that a

formation is considered an aquiclude does not affect whether it can also produce groundwater

or, presumably, be an aquifer—i.e., an aquiclude can also be a water-bearing formation. IESI was

not required, as urged by Two Bush, to "prove" that there was no usable groundwater in the

Pennsylvania formation to be able to identify it as an aquiclude to the Twin Mountain formation.

Further, IESI's characterization of the Pennsylvanian formation in the vicinity of the landfill as an

aquiclude does not "ignore" the existence of the Pennsylvanian system. Although IESI's experts

concluded that the Twin Mountain formation was the only regional aquifer in the vicinity of the

landfill and that the Pennsylvanian system was not an aquifer as it existed under proposed landfill

site, they did acknowledge the existence of the Pennsylvanian system and its groundwater in the

permit application.

IESI based its conclusions regarding the groundwater characterization in the vicinity

of the landfill—i.e., that the Twin Mountain formation, or Stratum II, was the only regional aquifer

and that the Pennsylvanian system, or Stratum III, served as an aquiclude—on a review of records

and maps at TCEQ and at the Texas Water Development Board (TWDB) report titled *Aquifers of*

*Texas*. *See* 30 Tex. Admin. Code § 330.56(d)(4) (requiring description of regional aquifers "based

upon published and open-file sources"). Both IESI and Two Bush's experts agreed that TWDB's

publication was the main source for identifying regional aquifers, and although Two Bush's

experts testified that the Pennsylvanian system was also a regional aquifer, IESI's expert explained

that he decided against characterizing it that way because the publications concluded that the

"Pennsylvanian formations produced limited quantities of groundwater that was of poor quality and that the formations were too erratic to map." Both the ALJ and TCEQ agreed with IESI's conclusion, finding that "[t]he Trinity Aquifer[] . . . is the regional aquifer." As detailed above, TCEQ's conclusion is supported by the substantial evidence. *See Pierce*, 487 U.S. at 564-65 (describing substantial evidence); *Lauderdale*, 923 S.W.2d at 836 (same).

Relatedly, Two Bush argues that IESI's failure to identify the Pennsylvania formation as being hydraulically connected to the Twin Mountain formation also rendered its application incomplete, and thus the permit improper. *See* 30 Tex. Admin. Code §§ 330.2(158) (defining "uppermost aquifer" as the "geologic formation nearest the nature ground surface that is an aquifer," including "lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary"), 330.56(d)(4)(E) (applicants must provide "information on whether the aquifers are hydraulically connected"), 330.56(e)(2) (requiring applicant to identify a groundwater characterization report that includes identification of uppermost aquifer "and any lower aquifers that are hydraulically connected to it beneath the facility"). But this argument necessarily assumes that the Pennsylvanian system is a regional aquifer because section 330.56(d)(4) only requires an applicant to describe "regional aquifers in the vicinity of the facility," and as set forth above, TCEQ found that only the Twin Mountain formation was a regional aquifer. If it is the only aquifer in the vicinity, it cannot be hydraulically connected to another aquifer in the vicinity.

But even if we were to assume that the Pennsylvania was a regional aquifer, the rule references lower aquifers that are hydraulically connected to the uppermost aquifer *"beneath the facility."* *See id.* (emphasis added). IESI's experts testified that the Twin Mountain formation—i.e.,

31

the uppermost aquifer—was not hydraulically connected to the Pennsylvanian formation beneath the proposed landfill site, and Two Bush's expert agreed that groundwater from the Twin Mountain formation would flow offsite from the landfill before it connected to the Pennsylvanian system. Thus, IESI was not required to identify the Pennsylvania formation in its groundwater characterization report, and more importantly, TCEQ's findings that the landfill site overlies both the Cretaceous and Pennsylvanian systems does not conflict with its conclusion that IESI's application was complete.

In another related argument, Two Bush asserts that because "IESI erroneously identified the [Twin Mountain formation] as the only aquifer in Stratum II, it failed to accurately identify the groundwater flow direction in that stratum" as required by TCEQ rules. *See id.* § 330.231(e)(1) (requiring that landfill's groundwater-monitoring system be based on "site-specific technical information," including groundwater flow direction). IESI concluded in its application, and TCEQ subsequently found, that "[g]roundwater generally flows to the north-northeast in Stratum II"—i.e., the Twin Mountain formation. TCEQ also found that "the Pennsylvanian formation flows generally to the west." Based on this TCEQ finding and on alleged findings that "the Pennsylvanian is an aquifer [that] sits below [Stratum II]," Two Bush argues now that IESI's application should have concluded that groundwater flows both north-northeast and west and should have included a plan that monitors this other groundwater flow.[9] But again, Two Bush's argument here assumes that TCEQ concluded that the Pennsylvanian is an aquifer. As was discussed above

---

[9] Two Bush also argues that "other [TCEQ] findings reflect that groundwater . . . flows to the south," but TCEQ's order does not refer to any groundwater that flows to the south. Regardless, it would not have an impact on our holding here.

32

in detail, TCEQ did not specifically find that the Pennsylvanian was an aquifer and, even if it did, it found that only Stratum II was a regional aquifer.

Regardless of TCEQ's findings regarding the Pennsylvanian, however, IESI complied with the requirements of the rule that Two Bush asserts it ignored. Generally stated, rule 330.231 requires a solid-waste landfill operator to monitor the groundwater of the uppermost aquifer, which the rules define as the "geologic formation nearest the natural ground surface that is an aquifer," including "lower aquifers that are hydraulically interconnected with this aquifer within the facility's boundary." *See id.* §§ 330.231(a) (requiring monitoring of uppermost aquifer), 330.4(158) (defining "uppermost aquifer"). The landfill operator must design that groundwater-monitoring system based on "site specific technical information" that includes, among other information, "groundwater flow direction." *See id.* § 330.231(e)(1). Although not specified in the subsection, it is reasonable to conclude that the information regarding "groundwater flow direction" referred to in this rule is for that of the uppermost aquifer because that is the groundwater that must be monitored. Given that TCEQ approved the permit, it must have construed the rule this way. *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624-25 (Tex. 2011) (providing that reviewing court give deference to a reasonable construction by an agency charged with the statute's administration if statute is ambiguous). Thus under rule 330.231, IESI had to design a groundwater-monitoring system to monitor only the Twin Mountain formation—i.e., Stratum II—and that monitoring system had to be designed based on the flow of that aquifer's groundwater because there are no other regional aquifers or aquifers that are hydraulically connected beneath the site's boundaries. TCEQ's finding that the Pennsylvanian groundwater flowed to the west does not affect

33

its conclusion regarding the uppermost aquifer. IESI's application included information regarding the groundwater-flow direction of the Twin Mountain formation—i.e., Stratum II—and the design of its groundwater-monitoring system for that aquifer was based on that information. Accordingly, TCEQ's finding that the Twin Mountain formation's groundwater flowed north-northeast is consistent with its decision to grant the permit. Finally, to the extent that Two Bush's argument here revisits its assertion that TCEQ's findings of facts conflict with its decision to grant the permit, we reject it for the same reason.

Two Bush also argues that TCEQ's finding that IESI "did not identify wells within one mile of the proposed facility," *see id.* § 330.56(d)(4)(J), renders TCEQ's conclusion that the groundwater was adequately protected arbitrary and capricious. But Two Bush reads this finding in isolation. At the contested case hearing, IESI introduced evidence that there were five wells within one mile of the landfill site and that this information was based on published and open-file sources as required by TCEQ rules. In other words, IESI referred to published and open-file sources and included the water-well information from those sources in its application. *See id.* § 330.56(d)(4). Two Bush's experts agreed that IESI relied on the generally recognized, published sources for water-well information in that area. But Two Bush also introduced evidence, collected from a door-to-door search in the area, that there were more wells within one mile of the landfill site than IESI had reported in application. Thus, based on this evidence, TCEQ found that although IESI had "[u]tiliz[ed] the regulatory-required standard of care for a water well search" in identifying the "five water wells within one mile of the permit boundary," IESI also had not identified all the wells within one mile of the vicinity. In other words, TCEQ found that IESI had met the rule requirements

for identifying water wells, but it also recognized the evidence Two Bush provided from its door-to-door search of the area. These findings are not inconsistent with each other or with TCEQ's decision to grant the permit because TCEQ rules do not require as extensive a search as that conducted by Two Bush. *See id.* § 330.56(d)(4). Where the public sources are not complete but where a party goes beyond the rule's requirements in garnering site information, TCEQ could reasonably find both that IESI submitted a regional-aquifer plan that met the requirements of the rules and that IESI failed to identify all the wells within the vicinity. Based on our analysis of the evidence, TCEQ's findings of facts and conclusions of law, and given the fact that TCEQ approved the permit, this is what TCEQ did here. Accordingly, its conclusions that the proposed groundwater-monitoring system, including the Special Provision, will adequately monitor the groundwater and will protect the groundwater, human health, and the environment as required by the Solid Waste Disposal Act and TCEQ rules is not arbitrary or capricious.

For similar reasons, we reject Two Bush's argument regarding IESI's failure to "adequately describe the present use of groundwater withdrawn from the aquifers in the vicinity of the facility." Two Bush argues that TCEQ made this finding because IESI failed to acknowledge the existence of the Pennsylvanian aquifer in the vicinity of the proposed landfill. But, as discussed above, it is not accurate to characterize IESI's treatment of the Pennsylvanian system as a failure to acknowledge its existence or its importance. IESI acknowledged in its application that the Pennsylvanian system is beneath the proposed site and that it contains groundwater, but because it does not produce significant quantities of water there and, more importantly, because it does not interact with the Twin Mountain formation *underneath* the site and because it is separated from

35

the Twin Mountain formation by an impermeable barrier, IESI's experts concluded that it was not a regional aquifer, and thus not required to be included in its report or be monitored as the uppermost aquifer. Thus, TCEQ's conclusions that the Pennsylvanian formation is an important source of groundwater for the area do not conflict with its conclusion that IESI's groundwater-monitoring plan will adequately protect the groundwater in the vicinity of the landfill site.

Two Bush also suggests that IESI's information regarding the area's water wells "resulted in an inaccurate understanding of the groundwater underlying the proposed landfill site" that would have an adverse impact on the Jacksboro community. Two Bush bases this assertion on the fact that some of the water wells near the proposed facility are completed in the Pennsylvanian formation—i.e., they draw water from that formation—and thus, Two Bush argues, IESI should monitor that formation as well because any breach in the landfill's liner would affect these wells. But this assertion incorrectly assumes that the only way to safeguard the water in the Pennsylvanian system is by directly monitoring that system. The evidence introduced at the contested-case hearing, however, shows that directly underneath the site, the uppermost aquifer is confined by an aquiclude. Generally stated, that means that groundwater of the Twin Mountain formation that is directly beneath the landfill site stays within that aquifer and does not flow into another formation underneath the site. Although the evidence also showed that groundwater from the Twin Mountain formation eventually recharges the Pennsylvanian formation, it does not do so within the boundaries of the landfill site. Thus, if the Twin Mountain formation's groundwater is monitored at the downgradient boundary of the landfill site—i.e., before it flows from underneath the site—that monitoring

36

will detect any leachate from the landfill. Accordingly, both the uppermost aquifer and the Pennsylvanian system are protected by IESI's groundwater-monitoring system.

Two Bush complains that IESI failed to comply with TCEQ rules requiring identification of areas of recharge to aquifers within five miles of the site. *See id.* § 330.56(d)(4)(I) (listing required information about regional aquifers, including "identification of areas of recharge to the aquifers within five miles of the site"). But our review of the record shows that IESI's application identified recharge zones for the Twin Mountain formation, which as discussed above is the only regional aquifer. Further, TCEQ's order does not find that IESI failed to identify the recharge areas as required by the rules.

Finally, Two Bush complains that IESI failed to adequately identify springs in the vicinity of the landfill as required by TCEQ rules and relatedly that TCEQ failed to include a finding on this failure. *See id.* § 330.45(a)(6)(A), 330.51(a)(1). Although Two Bush introduced evidence that it had canvassed local residents and those residents identified a feature in the area that they identified as either a "seep" or a "spring" in the vicinity of the landfill, IESI's expert testified at the contested-case hearing that he consulted a published treatise—Brune, *Springs in Texas* (2002)—and concluded that there were no springs in the vicinity of the landfill. Rule 330.45 does not specify the method by which an applicant must research spring information, but on this record it would be reasonable for TCEQ to allow TCEQ to rely on published and open-file sources as it does in the case of water-well identification. *See id.* 30 Tex. Admin. Code § 330.56(d)(4). Thus, there was sufficient evidence for TCEQ to find that IESI met regulatory requirements in its search for springs and that there were no springs in the vicinity of the landfill.

Relatedly, Two Bush complains that it was arbitrary and capricious for TCEQ to omit such a finding from its order. We disagree. TCEQ is required to make findings of facts that support its ultimate determinations that the statutory requirements—i.e., to protect the environment by controlling the management of waste, *see* Tex. Health & Safety Code Ann. § 361.002—for approving IESI's permit application had been satisfied. *See Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 449-53 (Tex. 1984); *State Banking Bd. v. Valley Nat'l Bank*, 604 S.W.2d 415, 419 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.); *see also* Tex. Gov't Code Ann. § 2001.141(b) & (d) (providing that "ultimate findings" regarding whether statutory prerequisites to agency's action have been met that are "set forth in statutory language . . . must be accompanied by a concise and explicit statement of the underlying facts supporting the findings"). Here, the evidence shows that IESI did not identify any springs in the area because it determined, based on its consultation of published sources on the topic, that there were none. Although the existence of springs may be relevant, TCEQ is not "required to comment on every aspect of the record that may be relevant to its ultimate findings" or make findings on matters that it did not rely for support of its ultimate determinations. *See Valley Nat'l Bank*, 604 S.W.2d at 419. Given that TCEQ made 200 findings of fact supporting its decision to grant the permit, including numerous findings regarding the surface and groundwater in the area, and given that the substantial evidence supports a conclusion that there are no springs in the vicinity of the proposed landfill, we would be subjecting TCEQ's order to a "hypertechnical" standard of review if we determined that its order here was arbitrary and capricious because it failed to make a negative finding of fact regarding the

38

existence of springs in the area.  *See State Banking Bd. v. Allied Bank Marble Falls*, 748 S.W.2d

447, 448-49 (Tex. 1988).

We overrule Two Bush's first issue.

**TCEQ's modifications of ALJ's findings and conclusions**

In its second cross-issue, Two Bush challenges TCEQ's revisions to the ALJ's

findings of fact and conclusions of law, arguing that the revisions were improper because (1) the

findings were not supported by a great weight of the evidence, (2) the conclusions were not clearly

erroneous in light of precedent and applicable rules, (3) TCEQ failed to provide a reasonable

explanation for its changes, and (4) TCEQ arbitrarily announced a new policy and applied it for the

first time in this case.  Specifically, Two Bush challenges TCEQ's changes to findings of fact 78,

122, 125, and 135, and to conclusion of law 8.

*Standard of review*

Section 361.0832 of the Solid Waste Disposal Act provides that TCEQ may overturn

an ALJ's finding of fact "only if [TCEQ] finds that the finding was not supported by the great

weight of the evidence."  *See* Tex. Health & Safety Code Ann. § 361.0832(c).  We have previously

interpreted this provision to allow TCEQ to "exercise its discretion to reverse those findings that

do not find support in the 'great weight' of the evidence in the record." *See Hunter Indus. Facilities,*

*Inc. v. Texas Natural Res. Conservation Comm'n,* 910 S.W.2d 96, 102-03 (Tex. App.—Austin 1995,

writ denied) (review of agency decision denying hazardous-waste permit).[10]  Thus, if there is

---

[10]  In doing so, we held that section 361.0832 has the opposite meaning of the "against the great weight of the evidence" standard.  *See Hunter Indus. Facilities, Inc. v. Texas Natural Res.*

evidence in the record supporting a contrary finding to that of the ALJ, TCEQ could properly weigh the evidence and reject that finding by the ALJ. *See id.* at 110-11 (holding that agency could properly reject hearing examiner's finding, despite undisputed and uncontroverted evidence at contested-case hearing, based on information elicited at agenda meeting to discuss the PFD). Conversely, if the great weight of the evidence—e.g., undisputed and uncontroverted evidence—supports the ALJ's finding, the agency may not reject an ALJ's finding of fact. *See id.* at 109 (holding that agency erred in rejecting hearing examiner's finding because there was no discrepancy in the evidence supporting finding). Section 361.0832 also provides that TCEQ "may overturn a conclusion of law in a contested case only on the grounds that the conclusion was clearly erroneous in light of precedent and the applicable rules." *See* Tex. Health & Safety Code Ann. § 361.0832(d).

### *Finding of fact 78*

TCEQ revised the ALJ's finding of fact number 78, which involves groundwater-flow direction information from testing wells, as follows—

78.    Points A-5 at 1,113.58 feet on the northwest corner of the site and F-20 at 1,112.06 in the southeast corner are the highest potentiometric points, but they are at opposite ends and have a trough between them; ~~therefore, it is not~~

---

*Conservation Comm'n,* 910 S.W.2d 96, 102-03 (Tex. App.—Austin 1995, writ denied). That standard, of course, requires a reviewing court to consider and weigh all the evidence; the court may reverse "only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence as that it is clearly wrong and unjust." *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)).

> ~~clear what direction groundwater will flow.~~ *point G-5 at 1,093.86 feet on the northeast corner of the site is the lowest potentiometric point.*

(Strikeout indicates deleted text; italics indicate added text.) As explanation for its changes to the ALJ's finding 78, TCEQ asserted—

> The Commission amended Finding of Fact number 78 to prevent contradiction with Finding of Fact number 65, finding that groundwater in Stratum II flows to the north-northeast. The Commission concluded, based on review of the record and after considering responses to questions at the open meeting, that groundwater in Stratum II flows generally to the north-northeast.

TCEQ's finding of fact number 65 provides, "Groundwater generally flows to the north-northeast in Stratum II at about 15 feet per year." On appeal, Two Bush asserts that TCEQ was wrong to change the ALJ's conclusions regarding groundwater-flow direction because the "ALJ's findings were supported by a great weight of the evidence." We disagree.

IESI introduced evidence, in both its application and its expert testimony, that the highest water levels from the wells completed in Stratum II were, as found by ALJ and TCEQ, at wells A-5 and F-20, both of which were located at the northwest corner of the proposed site. IESI's evidence also showed that the lowest water level from the testing wells completed in Stratum II was at well G-5, which was located on northeast corner of the site. IESI's expert testified that because, generally speaking, groundwater flows from the highest elevation to the lower elevation, the Stratum II groundwater underneath the proposed site flows north-northeast—i.e., from the higher elevation wells at A-5 and F-20 towards the lowest elevation in the northeast corner of the site. Thus, despite the fact that Two Bush's expert testified that she read this same data to

41

indicate that groundwater-flow direction was not clear, there was substantial evidence in the record that the Stratum II groundwater flowed north-northeast under the site. Accordingly, it was appropriate for TCEQ to weigh the evidence, reject the ALJ's finding, determine that groundwater flowed north-northeast, and modify the findings to reflect that finding. *See id.*

### *Findings of fact 122, 125, and 135 and conclusion of law 8*

TCEQ also amended several of the ALJ's findings of fact relating to the identification of water wells in the area :

> 122. *Utilizing the regulatory-required standard of care for a water well search,* the application identified five water wells within one mile of the permit boundary, two of which are within the permit boundary and not used.
>
> 125. Within one mile of [IESI]'s property boundaries, *evidence offered by [Two Bush], based on efforts beyond those required by the regulatory standards, indicate that* there are 46 wells, the majority of which are within one mile of the proposed permit's boundaries.
>
> 135. *Despite complying with the regulatory standard of care for identifying water wells,* [IESI] did not identify the location and list the aquifer of all water wells within one mile of the property boundaries of the facility.

(Emphasis indicates text added to ALJ's findings of fact.). Relatedly, TCEQ modified conclusion of law number 8 as follows: "[IESI] met its burden with respect to all referred issues ~~except identification of groundwater wells within one mile of the proposed facility's boundaries and areas of water recharge~~." (Strikeout indicates text deleted from ALJ's conclusion of law number 8.) As explanation for these changes, TCEQ asserted—

> The Commission amended Findings of Fact numbers 122, 125, and 135 and Conclusion of Law number 8 to reflect that, while not identifying all of the water wells with one mile of the proposed facility that were identified by protestant, the Applicant did comply with the regulatory standard of care for identifying water wells. The Commission determined that, as originally proposed, those findings were or

could be inferred to be in conflict with its interpretation of its rules and policies regarding what an applicant must do to comply with the requirement in 30 TAC § 330.56(d)(4) to identify wells. In its discussion, the Commission explained that the applicable rule required identification of wells and other information requirements in that rule was based on published and open file sources. The Commission determined, based on the record, that Applicant met this regulatory standard of care.

On appeal, Two Bush asserts that TCEQ's changes to these findings and conclusions are arbitrary and capricious because they are not based on the evidence in the record and because they amount to the expression of a new TCEQ policy regarding identification of water wells. We disagree.

As set forth above, rule 330.56(d)(4) provides that, "The owner or operator [of a solid-waste disposal site] shall provide a description of the regional aquifers in the vicinity of the facility based on published and open-file sources." *See* 30 Tex. Admin. Code § 330.56(d)(4). The description required by this rule must include the identification and aquifer "of all water wells within one mile of the property boundaries." *See id.* § 330.56(d)(4)(J). The text here is clear—i.e., the description required by this rule can be based on "published an open-file sources." We see no alternative construction that is reasonable. But even if we determined that the text of this rule is ambiguous, we are required to give serious deference to the agency's reasonable interpretation and, as stated by TCEQ, that interpretation is that the operator may rely on "published and open-file sources." *See Texas Citizens*, 336 S.W.3d at 624-25 (providing that reviewing court gives deference to a reasonable construction by an agency charged with the statute's administration if statute is ambiguous).

With regard to the evidence supporting these changes, we again point to the evidence introduced by IESI that it relied on a review of records and maps at TCEQ and TWDB, including

43

TWDB's publication *Aquifers of Texas*, and on evidence from both sides' experts that the TWDB's publication was the main source for identifying regional aquifers in Texas. Stated another way, there is substantial evidence in the record that IESI based its regional-aquifer report on "published and open-file sources." In fact, we are unaware of any evidence in the record showing that IESI did not rely on "published and open-file sources." Accordingly, it was appropriate for TCEQ to modify the ALJ's findings of fact to reflect its finding that IESI followed the regulatory standard of care for identifying water wells. *See Hunter*, 910 S.W.2d at 102-11. Likewise, having so modified these findings of fact, it was appropriate for TCEQ to modify the related conclusion of law to reflect the corrected findings. *See id.* at 112.

We overrule Two Bush's second cross-issue.

**ALJ's exclusion of evidence**

In its final cross-issue, Two Bush complains of the ALJ's exclusion of evidence during the contested-case hearing. Specifically, Two Bush asserts that the ALJ abused her discretion by excluding, during the rebuttal phase of testimony, evidence offered by Two Bush regarding "IESI's deficient groundwater characterization." We disagree.

We review an ALJ's rulings on the admission or exclusion of evidence under the same abuse-of-discretion standard we apply to trial courts. *See City of Amarillo v. Railroad Comm'n*, 894 S.W.2d 491, 495 (Tex. App.—Austin 1995, writ denied); *see also* Tex. Gov't Code Ann. §§ 2001.081 (applying rules of evidence to contested-case hearings), .082 (providing that "irrelevant, immaterial, or unduly repetitive" evidence be excluded from evidence in contested-case hearing). A trial court abuses its discretion when it acts arbitrarily or unreasonably, without

44

reference to guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A trial court also abuses its discretion by failing to analyze or apply the law correctly. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). Although there is some question as to whether the evidence is properly in the record before us, we will assume it is and address the merits of Two Bush's complaint.

During presentation of IESI's case-in-chief, its expert witness, John Snyder, who had prepared the hydro-geological portions of IESI's permit application, including potentiometric surface maps showing data collected from piezometers located at the landfill site, testified regarding his opinion about the flow of groundwater underneath the proposed landfill site.[11] During Two Bush's case-in-chief, its expert witness, Lauren Ross, who disagreed with Snyder's conclusions regarding the groundwater, testified that Ross had misinterpreted the piezometer data and that misinterpretation was reflected in IESI's potentiometric surface map. Among other matters, she explained that there was an "anomalous" point on the map that she attributed to a dry monitoring well.

To rebut Ross's testimony, IESI recalled Snyder as part of its rebuttal case and questioned him regarding his interpretation of the piezometer data. Snyder explained on rebuttal about the piezometer data, including that he had disregarded data taken from the dry well—i.e., the one referenced by Ross as creating an anomalous point on the map—and presented his opinion,

---

[11] According to the evidence in the record, a potentiometric surface map is a map with contour lines representing the groundwater elevations as measured by the piezometers at the various monitoring wells on the site. A piezometer is "an instrument for measuring pressure." *Webster's Third New Int'l Dictionary* 1713 (2002). In the context of this case, the piezometers, located at various monitoring wells around the site, were used to measure the local static pressure of moving groundwater.

45

again, regarding the groundwater at the proposed landfill site. On rebuttal cross-examination, Two Bush's attorney asked Snyder if he had relied on data from the dry well in creating the pentiometric surface map. Snyder confirmed that he had not used data from the dry well. Two Bush's attorney then offered an exhibit consisting of two TCEQ "notices of deficiency" to IESI and IESI's responses to those letter. IESI objected to the exhibit on the grounds that the exhibit was outside the scope of rebuttal testimony as established by a pretrial order. The ALJ sustained the objection and excluded the exhibit based on her determination that the evidence was not proper rebuttal evidence under the terms of the pretrial scheduling order.

On appeal, Two Bush asserts that the exclusion of this exhibit was an abuse of the ALJ's discretion because the exhibit was offered in direct response to Snyder's testimony that he had disregarded the data from the dry well and because there is no evidentiary rule requiring that impeachment evidence be used during a party's direct case. IESI, however, argues that Two Bush's argument fails to account for a provision in the pretrial scheduling order for the contested-case hearing that could be interpreted to limit the admission of new evidence that should have been offered during a party's direct case:

> All parties shall pre-file their entire direct case evidence by the indicated date on the procedural schedule. Documents to be admitted through cross-examination need not be prefiled. The prefiled evidence should include all testimony and exhibits necessary to support the party's direct case. . . . Evidence that is not prefiled may not be introduced through direct examination absent a showing of good cause. . . .

IESI's attorney argued to the ALJ that this provision was meant to exclude supplemental or unfiled evidence offered to support a party's direct case and that the offered exhibit supported Two Bush's direct case challenging the validity of Snyder's groundwater-flow analysis. IESI emphasizes that

46

Two Bush's expert Ross was called to establish this very point—i.e., that IESI's groundwater flow analysis was incorrect. We agree that the pretrial order required Two Bush to pre-file all of its direct-case evidence and, while we understand that an argument could be made that the same provision would also allow Two Bush to offer evidence during cross-examination, it is not unreasonable to interpret the entire provision as forbidding, absent a showing of good cause, admission of unfiled evidence that supports a party's direct case. Accordingly, we cannot say that the ALJ abused her discretion by excluding the proffered evidence. Further, we note that the exhibit appears to be cumulative of Ross's and Snyder's testimony and of other admitted exhibits. Thus, even if it was error for the ALJ to exclude the exhibit, it was harmless error. *See State v. Central Expressway Sign. Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (holding that exclusion of testimony is harmless if evidence cumulative). We overrule Two Bush's third cross-issue.

## CONCLUSION

Having sustained IESI's, the City of Jacksboro's, and TCEQ's issue regarding the Special Provision and having overruled IESI's and the City of Jacksboro's jurisdictional issues and Two Bush's cross-points, we reverse the district court's judgment and render judgment affirming TCEQ's original order.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose, and Goodwin

Reversed and Rendered

Filed:   February 10, 2012